

**FILED**
September 12, 2022 03:49 PM
SX-2005-CV-00368
**TAMARA CHARLES**
**CLERK OF THE COURT**

**SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

JOSEPH GERACE, VICTORIA VOOYS, D/B/A
CANE BAY BEACH BAR,

PLAINTIFFS,

V.

MARIA BENTLEY; DAVID BENTLEY; CB3,
INC.; WARREN MOSLER; CHRIS HANLEY;
AND CHRISMOS CANE BAY, LLC,

DEFENDANTS.

Case No. SX-2005-CV-00368

Action for Damages

Jury Trial Demanded

## JUDGMENT

**AND NOW,** for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that Count I, Count II, and Count III are **DISMISSED** as to Defendants David Bentley, Maria Bentley, and CB3, Inc. and judgment is further entered in favor of Defendants David Bentley, Maria Bentley, and CB3, Inc. on all three counts. It is further

**ORDERED, ADJUDGED, AND DECREED** the Count V is **DISMISSED** as to Defendant Chrismos Cane Bay, LLC and judgment is further entered in favor of Defendant Chrismos Cane Bay, LLC on Count V. It is further

**ORDERED, ADJUDGED, AND DECREED** that Count VI, Count VII, Count IX, and Count X are **DISMISSED** as to Defendants Warren Mosler, Chris Hanley, and Chrismos Cane Bay, LLC and judgment is further entered in favor of Defendants Warren Mosler, Chris Hanley, and Chrismos Cane Bay, LLC on all four counts. It is further

**ORDERED, ADJUDGED, AND DECREED** that Count IV and Count XI are **CONSTRUED** as a demand for punitive damages. It is further

**ORDERED, ADJUDGED, AND DECREED** that judgment is entered in favor of Plaintiffs Joseph Gerace and Victoria Vooys doing business as Cane Bay Beach Bar in the amount of **one-hundred thousand ($100,000.00) dollars** against Defendants Warren Mosler, Chris Hanley, and Chrismos Cane Bay, LLC, jointly and severally, on Count VIII, including post-judgment interest at 4% per annum per the statutory rate set by Title 5, Section 426(a) of the Virgin Islands Code. As no motion for attorneys' fees was filed, the Court will defer further consideration until after the time to appeal has passed or appellate proceedings have resolved. It is further

**ORDERED, ADJUDGED, and DECREED** that the counterclaim of Defendant Chrismos Cane Bay, LLC is **DISMISSED** and judgment is further entered in favor of Plaintiffs Joseph Gerace and Victoria Vooys doing business as Cane Bay Beach Bar on the counterclaim.

**DONE and so ORDERED this** 12th **day of September, 2022.**

**HAROLD W.L. WILLOCKS**
Administrative Judge of the Superior Court

**ATTEST**:
Tamara Charles
Clerk of the Court

By: _____
Court Clerk
Dated: ____9/12/2022____



**FILED**
September 13, 2022 03:53 PM
SX-2005-CV-00368
TAMARA CHARLES
CLERK OF THE COURT

**SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| JOSEPH GERACE, VICTORIA VOOYS, D/B/A CANE BAY BEACH BAR, | Case No. SX-2005-CV-00368 |
| PLAINTIFFS, | Action for Damages |
| V. | Jury Trial Demanded |
| MARIA BENTLEY; DAVID BENTLEY; CB3, INC.; WARREN MOSLER; CHRIS HANLEY; AND CHRISMOS CANE BAY, LLC, | |
| DEFENDANTS. | |

## ORDER

**AND NOW**, for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Post-Trial Rule 50(b) and Rule 59(a) Motion filed by Defendants Warren

Mosler, Chris Hanley, and Chrismos Cane Bay, LLC is **GRANTED in part** as to the motion to set aside

the verdict as to Count V, Count VI, and Count X, and the award of punitive damages, and **DENIED** as

to the motion to set aside Count VIII and **DENIED** as to the motion for a new trial. It is further

**ORDERED** that the jury's verdict as to breach of an agreement to enter into a lease, breach of the

duty of good faith and fair dealing, and defamation, and the award of punitive damages, are **SET ASIDE**.

**DONE and so ORDERED this** 12ᵗʰ **day of September, 2022.**

**HAROLD W.L. WILLOCKS**
Administrative Judge of the Superior Court

ATTEST:
Tamara Charles
Clerk of the Court

By: _____
Court Clerk II
Dated: 9/12/2022

## SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

JOSEPH GERACE, VICTORIA VOOYS, D/B/A
CANE BAY BEACH BAR,

                    PLAINTIFFS,

v.

MARIA BENTLEY; DAVID BENTLEY; CB3,
INC.; WARREN MOSLER; CHRIS HANLEY;
AND CHRISMOS CANE BAY, LLC,

                    DEFENDANTS.

Case No. SX-2005-CV-00368

**Action for Damages**

**Jury Trial Demanded**

Cite as: 2022 VI Super 78

**Appearances:**

**LEE J. ROHN, ESQ.**
Lee J. Rohn & Associates, LLC
Christiansted, VI 00820
*For Plaintiffs*

**JOEL H. HOLT, ESQ.**
Law Offices of Joel Holt
Christiansted, VI 00820
*For Warren Mosler, Chris Hanley, and Chrismos Cane Bay, LLC*

## <u>MEMORANDUM OPINION</u>

**WILLOCKS, Administrative Judge.**

¶1     **BEFORE THE COURT** are the post-trial motions of Warren Mosler (hereinafter "Mosler"), Chris Hanley (hereinafter "Hanley"), and Chrismos Cane Bay, LLC (hereinafter "Chrismos") (collectively "Defendants" or "Chrismos Defendants") to vacate the jury's entire verdict or, in the alternative, for a new trial based on statements of opposing counsel during closing arguments. Joseph Gerace (hereinafter "Gerace") and Victoria Vooys (hereinafter "Vooys"), formerly doing business as Cane Bay Beach Bar (hereinafter "Beach Bar") (collectively "Plaintiffs"), oppose the Defendants' motions. For the reasons

stated below, the Court will grant the motion for post-trial relief in part and set aside the jury's verdict on the breach of contract, breach of the duty of good faith and fair dealing, and defamation claims but otherwise affirm the verdict on the intentional misrepresentation claim. Additionally, because the jury awarded a single amount in compensatory damages on all the business torts, the Court must affirm the entire award since the Court cannot reallocate damages and remittitur is not available in the Virgin Islands. The Court will also vacate the award of punitive damages because the evidence was insufficient for a rational trier of fact to have found that Mosler and Hanley acted with reckless disregard. Lastly, finding no prejudice to the Defendants from Plaintiffs' counsel's remarks, the Court will deny their alternate request for a new trial.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

¶2     Gerace and Vooys met in culinary school in Arizona. They decided to go into business together and "came across Cane Bay Beach Bar on St. Croix, on the internet." (Trial Tr. 168:24-25.[1]) Gerace traveled to St. Croix in June of 2003 to check out the restaurant. He "looked at it and fell in love with the island[,]" he told the jury. *Id.* at 438:24-25. "It was everything a 25-year-old kid can dream for." *Id.* at 439:16-17. The first time Vooys saw the restaurant—and the first time she stepped foot on St. Croix— was after she and Gerace had driven their belongings "down to Florida, got on a plane, [and] landed." *Id.* at 169:20-22. They found out in Florida, just before leaving for St. Croix, that the previous owner of the Beach Bar did not have a lease for the restaurant. *See id.* at 172:14-17. Gerace and Vooys were engaged to be married. So, they continued on because they that "had gotten that far. We had sold a condo, packed up all our stuff. . . . So when we found out there was no lease, we thought we'd take a leap of faith and

---

[1] Unless otherwise noted, all citations to a transcript are from the transcripts of the trial. Additionally, the Court has omitted giving the day of the trial because the court reporter paginated the trial transcripts consecutively, even though each day of trial is contained in separate volumes.

continue." *Id.* at 172:19-24. Not long after they arrived on St. Croix, Gerace and Vooys also learned "that the landlord was going to . . . sell the property." *Id.* at 173:2-3.

¶3    Gerace closed on the sale of the restaurant on August 7, 2003, and started running it the same day. "A few weeks after that, Hanley and Mosler came to introduce themselves as the new landlords." *Id.* at 173:15-16. Mosler & Hanley had formed Chrismos, a limited liability company, on September 7, 2003, to purchase the property, on which the Beach Bar was situated, for $1,050,000. A dive shop, the Cane Bay Dive Shop (hereinafter "Dive Shop"), owned and operated by Hal and Susan Rosbach, was located to the back of the same building. The Beach Bar and the Dive Shop shared a cistern and electricity. One, contiguous roof also covered the entire structure.

¶4    During their initial discussions with Mosler and Hanley, Gerace and Vooys asked for a seven-year lease. "We were just taught in school, seven years. Five and five is okay, but seven years is the best lease for a restaurant. . . [b]ecause the first three years you're not even making a profit yet, so if there's anything shorter than seven, you need time to stay there long enough to recoup your investment[,]" she told the jury. *Id.* at 174:3-10.[2] The prior Beach Bar owner, Maria Bentley, had been paying the prior landlord $1,500 a month, which included a residential cottage on the property. Gerace and Vooys continued paying the same amount but were not given a cottage to live in. When they first discussed a seven-year lease, Mosler and Hanley "said that that seemed . . . reasonable. We would work on that and we'd get one, you know. We'd talk more about it." *Id.* at 175:10-12.

¶5    Mosler and Hanley had conditions for getting a seven-year lease, however. Gerace and Vooys had to "make some improvements, general cleanup, some repairs, paint the place," *id.* at 175:23-24, repairs they "thought were the landlord's responsibility . . . ." *Id.* at 175:25-176:1. Vooys explained that they

---

[2] "Five and five" refers to a five-year lease with an option to renew for a second five-year term. (*Cf.* Trial Tr. 235:18-20.)

"went ahead and . . . replaced screens and plywood and the outside of the kitchen[,]" "resurfaced the bar[,]" "power washed and did general cleanup and . . . painted." *Id.* at 176:9-11. They replaced ice coolers. They also hired more bartenders. *See id.* at 155:7-13. "We had to replace the sinks in the bathroom[,]" Vooys explained, even though "things that are fixture[s] should normally be the landlord's responsibility." *Id.* at 176:11-14. The Beach Bar also had to split water and electricity costs with the Dive Shop and Vooys said she asked Mosler and Hanley about getting separate meters installed. Rosbach had informed Gerace and Vooys after they purchased the Beach Bar that the Bar pays 2/3 of the bill and the Dive Shop pays 1/3. Vooys thought that might not be fair. Gerace and Vooys could not install separate meters because they did not own the building.

¶6     John Reed (hereinafter "Reed") worked for the Beach Bar as a bartender through multiple owners. He helped Gerace and Vooys with the repairs Mosler required for getting a lease: cleaning, power washing the deck, painting. "It went on for a while. Two to three weeks, at least, for the initial part. We kept doing more after we opened[,]" Reed recalled. *Id.* at 510:22-24. Gerace's younger brother, Edward, also moved to St. Croix in August 2003 at the age of 21, to help him and Vooys run the Beach Bar. He "was to be a barback . . . [or] a bartender helper." *Id.* at 417:6-7. He also worked as a line clerk for Sunday brunches and helped with the full moon parties. He was there when Gerace and Vooys closed on the restaurant and described the state as "need[ing] some work. There was painting. There was maintenance issues. There was nails coming out of the floor boards." *Id.* at 418:6-8. Michael Belcheff (hereinafter "Belcheff") corroborated their testimony. He met Vooys and Gerace "when they took over the restaurant . . . ." *Id.* at 400:24-25. He recalled that they went "crazy making all kinds of improvements, making the place better, just . . . working their butts off." *Id.* at 401:3-5. Belcheff even helped with some of the repairs like "carpentry, some electrical work, . . . helping them with the lighting . . . ." *Id.* at 402:6-8.

¶7     Vooys testified that Mosley and Hanley wanted them to prioritize the repairs to the restaurant over

rent and were "pretty casual" about whether rent was paid on time. *See id.* at 193:13-14. At first, Hanley "was going to come by and pick up the rent when he would stop by." *Id.* at 175:5-6. Later, Mosler and Hanley told Gerace and Vooys to drop the rent off at Hanley's real estate office, Farchette & Hanley, "whenever [they] went to run errands in town . . . ." *Id.* at 193:7-11, 194:1. Hanley agreed that he had said Chrismos would be flexible on the rent. However, his deposition testimony, which was read to him, established both that rent was due on the 1st of the month, and late if not paid by the 2nd of the month, but also that if "they were current by the end of the month on the rent, we were completely fine with that. And that went for the dive shop as well." *Id.* at 651:5-7.

¶8    Sometime in the beginning of March 2004, Mosler and Hanley gave Gerace and Vooys a proposed lease. *Id.* at 184:19-21. Vooys testified that the lease was "terrible."

> We'd asked for seven years, because you need – you won't make profit for at least three years. This lease was two or two and a half years. We couldn't assign it; so in the future if we did want to turn the bar over to someone else, we would have to have them get a new lease. There was a late fee, penalty[,] and attorney fees. . . . [W]e had to decline our right to a trial by jury if there was a conflict. And they were not obligated to do any repairs, like the repairs we'[d] been talking about, on the building. . . . [And rent] was going to go from [$]1,500 to [$]2,000. *Id.* at 186:22-187:9.

Later that month Vooys shared their concerns with Hanley who agreed, according to her, that "it was a terrible lease . . . ." *Id.* at 187:11-12. Hanley told them "they'd work on a better one." *Id.* at 187:13.

¶9    In August 2004, a fire broke out in the kitchen. The hood over the stove was too small for the size of the space. Vooys and Gerace "had to order and ship and install another hood, a larger hood, exhaust fan, new fire suppression Ansul system, electrical, backsplash for the kitchen." *Id.* at 190:24-191:1. The Beach Bar had to close for two months while they made the repairs and waited for parts to be shipped on-island. They approached Mosler & Hanley for assistance with the repairs or forgiveness on the rent but were only allowed to pay the rent late. Full rent had to be paid, Vooys told the jury, and she and Gerace had to do all the repairs and buy all the equipment themselves. Because of the fire, Vooys and Gerace

asked Mosler, "before we do all these repairs, are we going to get a seven-year lease before we put a bunch of money into this place?" *Id.* at 187:20-22. According to Vooys, Mosler said "[t]hey wanted to wait until they fixed everything and got up and running and then we'd talk about it again." *Id.* at 191:16-17; *see also id.* at 192:1 (identifying Mosler as the person who made the assurances).. Vooys estimated the repairs from the fire cost them between $15,000 and $20,000.

¶10    Mosler and Hanley offered Vooys and Gerace another lease in November 2004, but with few differences from the previous one in March. The name of tenant was changed from Joseph Gerace to Barabus, Inc., the corporation Vooys and Gerace had formed on August 12, 2003, and the rent was put back at $1,500, but would also increase sometime later to $2,500. The lease also was not for seven years as they had asked. So Vooys and Gerace reached out to Gerald T. Groner, Esq., the attorney they had used to form Barabus, for advice about the second lease. Neither could recall if Attorney Groner reached out to Mosler and Hanley's attorney, and they never followed up with Attorney Groner. *See id.* at 467:22-468:13.

¶11    Sometime in February 2005, Rosbach, the Dive Shop owner, introduced Reed to James Jordan (hereinafter "Jordan"). Jordan asked Reed to meet him at Off the Wall, another bar and restaurant on St. Croix's north shore not far from the Beach Bar. They met after Reed finished work. Jordan told Reed that "[h]e was going to be taking over the lease and Warren Mosler was his boss . . . ." *Id.* at 514:10-11. Jordan asked Reed if he "was interested in going to work for them." *Id.* at 514:12. Reed said yes because he needed the job. Jordan asked Reed "to keep everything low, don't tell anybody, which [Reed] didn't feel too good about, but [he] went with it." *Id.* at 514:13-15.

¶12    Beginning in March 2005, Mosler began to accuse Gerace and Vooys of being behind on their rent. He also visited the restaurant around the same time and told them that

> he did not like the direction [they] . . . were taking the bar and restaurant. He had issues
> with the full moon parties and the crowds and element that the parties brought. He wanted
> to turn it in a white, middle-class restaurant and he had somebody in place to take over

from . . . [them] and [they] . . . needed to make this transaction within a month. (201:23-202:4.)

Vooys disagreed, saying she was "pretty adamant about . . . cleanliness, especially in a bathroom." *Id.* at 178:21-22. "If you're in a restaurant, if people see a dirty bathroom, they think your kitchen is dirty. So I was adamant about cleaning[,]" she said. *Id.* at 176:22-24. "My employees knew the bathrooms had to be spick and span." *Id.* at 176:25. Donna Christensen (hereinafter "Christiansen"), family physician and former delegate to Congress, corroborated Vooys's testimony, saying she had no problem with the cleanliness of the restaurant or the bathroom but had only patronized the Beach Bar a few times. John H. Woodson, III (hereinafter "Woodson") agreed. He owns a home in LaVallee on St. Croix, where he lived until 2011, when he moved to St. Thomas. He frequented the Beach Bar and attended most of the full moon parties when Gerace and Vooys owned it. He said he found the cleanliness of the bathrooms and the restaurant "normal . . . . Otherwise, [he] would not eat there." *Id.* at 390:19-24.

¶13     Gerace and Vooys called Hanley to ask what was going on because they had "just got back on [their] feet and . . . [by] the beginning of 2005 . . . were doing great." *Id.* at 202:15-17. Hanley told them that Mosler "had a guy in place . . . and . . . [he] wanted that guy to take over." *Id.* at 202:20-22. They told Hanley they did not want to sell and the four had a meeting about a week later. According to Vooys, "Mosler told us we were not getting a lease. . . . [H]e did not like the way we were running the restaurant. He thought it was dirty." *Id.* at 204:1-3. "He reiterated he didn't like the direction we were going and the clientele we were bringing in and he wanted to be able to bring his clients to have meetings, more like a white, middle-class restaurant, and we needed to come up with an exit strategy." *Id.* at 204:14-18. Mosler also complained that "[t]here were too many dogs around[,]" *id.* at 205:3, and said that they "just weren't making a go of it, that [they] didn't know what [they] were doing." *Id.* at 205:6-7. Vooys walked away and went to the back of the restaurant and "wailed". *Id.* at 205:18. Gerace came back to check on her and

console her and when they returned Mosler & Hanley had left. Belcheff corroborated their testimony. He said he saw Mosler and Hanley meeting with Gerace and Vooys, so he left, and retuned about 30 minutes later. When he returned, he "saw Vic crying . . . [and] Joe with like a stunned look on his face . . . ." *Id.* at 405:9-10.

¶14    Hanley came back a few days later to discuss "facilitating th[e] transfer from [them] to the[] guy they wanted to come in and take over . . . ." *Id.* at 207:10-12. Hanley offered to give Gerace and Vooys a lease but only so they could sell it to Jordan. Jordan insisted on having a lease before he would take over the Beach Bar. Chrismos then served a letter on Vooys and Gerace, dated April 12, 2005, saying that it was their understanding that Gerace and Vooys had agreed to vacate the premises by the end of the month and if not, their property would be confiscated. The letter concluded by asking Vooys and Gerace to confirm whether Mosler and Hanley's recollection of their discussion was accurate. Vooys and Gerace reached out to Lee J. Rohn, Esq. who sent a letter on April 20, 2005 on their behalf, stating that they had no intention of leaving the Beach Bar.

¶15    According to Vooys, Mosler then "started like a smear campaign on why he was getting rid of [them] on the radio and TV." *Id.* at 208:10-11. No one could recall exactly when, but Vooys recalled that it was after they received the April 12, 2005 letter. The talk show was hosted by Roger Morgan (hereinafter "Morgan"). Morgan read the April 12, 2005 letter on the radio and Mosler told listeners that he was "getting rid of [Gerace and Vooys] because [they] didn't know what [they] were doing . . . were always late on rent . . . were behind on rent, [and] . . . didn't know how to run a restaurant." *Id.* at 210:1-4. Vooys also said she heard Mosler claim that he had reduced their rent, which she denied. Reed heard Mosler on the radio talking negatively about the Beach Bar and Gerace and Vooys, "saying that they didn't pay rent, that they – supposedly loud parties were there. I think they even mentioned something about drugs or something in that area on the radio[,]" he said. "[I]t was always negative." *Id.* at 520:21-25. Christensen

too heard about Mosler being on Roger Morgan's show talking about the Beach Bar but had not heard the show herself. Woodson went on the radio show to complain about Gerace and Vooys being put out of the Beach Bar. He told listeners the reason was not "noise . . . [but] the music and type of clientele that that music probably brought." *Id.* at 392:18-20. Hanley too went on the radio show, and so did Vooys but only because Morgan called her for a rebuttal. Hanley said he went on the radio to "defend[ his] . . . character . . . [his] position, and . . . made statements that were basically countering the lies and inaccuracies that they were claiming on the radio." *Id.* at 624:2-5. Hanley said Vooys and Gerace were telling everyone that "they were always current on their rent and that they were current at that time, and [he] stated that that's not true. They had been late a lot and that they were not current at that time, when [he] was on the radio." *Id.* at 624:8-11. Later that afternoon, after Hanley spoke on the Roger Morgan show, Vooys and Gerace arrived at Farchette and Hanley "with April's rent check." *Id.* at 624:18.

¶16    Business started to decline after Mosler went on the radio. Reed recalled that "for the last couple months . . . Joe and Vic were there, this whole radio thing was going on and . . . everybody that came in or I saw elsewhere was talking about it, not in a good way." *Id.* at 535:16-19. Vooys and Gerace signed an asset purchase agreement with Jordan, dated June 17, 2005, for $30,000. Jordan initially offered $50,000. "By the time we signed and left, we just felt like total failures[,]" Vooys testified. *Id.* at 222:6-7. "It's like we lost everything[,]" she explained. "And it's not just money, it's energy. You know, we were there like ten, 12 hours a day every day. You know, you put a lot of passion into it. We loved that place and the people that – that became our patrons and it just stunk." *Id.* at 205:21-25. Anthony recalled Vooys and Gerace  "were majorly bummed," *id.* at 162:3, when they learned they had to leave. He also said the Beach Bar declined after they Gerace and Vooys left. "Less locals." *Id.* at 163:3. Anthony continued to attend and reggae music is still played at the bar though "not as often . . ." *Id.* at 164:5. He stopped going as frequently because "[t]he food wasn't as good. We weren't having as much fun. Less and less of people

that we used to hang out who were also locals were going there." *Id.* at 165:12-14.

¶17    Vooys testified that when they left at the end of June, they did not owe WAPA and did not owe anything to the Dive Shop. She estimated that they had spent $40,000 on repairs, $20,000 on equipment, and $50,000 in good will such as advertising and promotions. Vooys and Gerace left island for a time after leaving the Beach Bar but returned to start a new business, Club 54, in August or September of 2005. Vooys testified that she had not returned to the north shore until days before trial and never returned to the Beach Bar. "It was too emotional. Too emotional, too painful. Too embarrassed." *Id.* at 230:17-18.

¶18    In the interim, on June 8, 2005, Gerace and Vooys, doing business as Cane Bay Beach Bar, sued the former owners, Maria Bentley, David Bentley, and their company CB3, Inc. (collectively the "Bentleys"), as well as Mosler, Hanley, and Chrismos. From the Bentleys, Vooys and Gerace sought damages, including punitive damages, for breach of contract (Count I), fraud (Count II), and misrepresentation (Count III) for not having a lease and not owning the "Cane Bay Beach Bar" tradename. From Chrismos, Vooys and Gerace sought damages, including punitive damages, for breach of an agreement to enter into a lease (Count V). From Chrismos, Mosler, and Hanley, Vooys and Gerace sought damages, including punitive damages, for defamation, slander, libel, and defamation *per se* (Count VI), fraud (Count VII), misrepresentation (Count VIII), intentional or negligent infliction of emotional distress (Count IX), and breach of the duty of good faith and fair dealing (Count X). The demands for punitive damages were erroneously labeled as Counts IV and XI, respectively, as to the Bentleys and the Chrismos Defendants.

¶19    Chrismos and Mosler appeared on July 12, 2005, and jointly answered the complaint but counterclaimed separately. Mosler asserted a counterclaim for defamation [check that] and Chrismos asserted a debt counterclaim for unpaid rent. Chrismos also asserted the affirmative defenses of failure to state a claim for relief, statute of frauds, laches, estoppel, waiver, unclean hands, and failure of

consideration. Mosler did not assert any affirmative defense. David Bentley appeared on July 13, 2005, and answered the complaint. Hanley appeared on August 22, 2005, answered the complaint, and asserted the same affirmative defenses as Chrismos. He did not assert a counterclaim. The Court (Ross, J.) entered default against Maria Bentley and CB3, Inc. on December 29, 2005, and entered on January 2, 2006. Maria Bentley appeared *pro se* on January 23, 2006, answered the complaint, and asserted a counterclaim on her own behalf and on behalf of CB3, Inc. for the unpaid balance on the sale of the Beach Bar. On January 24, 2006, Bentley moved to vacate her default, which the Plaintiffs opposed. The case then went dormant for several years until the Chrismos Defendants moved to dismiss for failure to prosecute or for a stay pending the posting of a bond. The Court (Donohue, P.J.) later denied the motion to dismiss but also directed the parties to submit a propose scheduling order to get the case back on track.[3]

¶20    After several extensions of discovery deadlines, David Bentley was dismissed, over Plaintiffs' objection, because Plaintiffs failed to file a motion within 90 days to substitute a personal representative for Mr. Bentley after he died in a plane crash. Discovery, and motions pertaining to discovery, continued for several years. Eventually the case was reassigned to this Court who, on April 14, 2016, dismissed the complaint after the Plaintiffs, who subsequently had moved off-island, failed to post a bond in accordance with Title 5, Section 547 of the Virgin Islands Code. *See Gerace v. Bentley*, 62 V.I. 254 (Super. Ct. 2015), *rev'd* 65 V.I. 289 (2016). On appeal, the Supreme Court of the Virgin Islands reversed and remanded, holding the statute unconstitutional. *See Gerace v. Bentley*, 65 V.I. 289 (2016), *writ dismissed sub nom. Vooys v. Bentley*, 69 V.I. 975 (3d Cir. 2018) (*en banc*). On remand, and after delays due in part to the COVID-19 pandemic, jury selection and trial commenced on February 24, 2022. Plaintiffs, Maria Bentley, and the Chrismos Defendants previously had submitted a proposed joint final pretrial order, which the

---

[3] The case had been reassigned to the Honorable Julio A. Brady after the retirement of the Honorable Edgar D. Ross. It was reassigned to the Honorable Darryl Dean Donohue, Sr. after Judge Brady recused himself.

Court approved on August 12, 2021, in which Mosler dropped his counterclaim for defamation. Plaintiffs, Maria Bentley, and CB3, Inc. also voluntarily dismissed their claims and counterclaims against each other before trial, leaving only the claims by and against Chrismos Defendants to be decided by the jury.

¶21    In addition to the testimony summarized above, the jury was also presented with documentary evidence. Plaintiffs' Exhibit 47 is a group of cancelled checks. The first two checks, numbered 355 and 357, were written by Vooys on her Bank of America account to the Farchette & Hanley Escrow Account, for $1,500.00 (for October 2003) and $3,000.00 (for November and December 2003). The remaining checks were issued by Cane Bay Beach Bar on a FirstBank VI account, also to the Farchette & Hanley Escrow Account. Collectively, the checks show rent the Plaintiffs paid from October 2003 to June 2005, but on an irregular basis. At least one rent check bounced but it was eventually covered. Vooys and Gerace also paid rent for June 2005 before vacating the premises at the end of that month. All checks were made out to Farchette & Hanley, not to Chrismos or to Hanley or Mosler directly.

¶22    Copies of some of the rent checks, specifically checks numbered 544 for $921.00 and 772 for $2,000.00, differed between the parties. On Defendants' copy of check number 544, the memo line reads: "Rent March – Plumber Bills", while on Plaintiffs' copy March is crossed out, "April" is written above March, and parentheses are added around the words "Plumber Bills." On Defendants' copy of check number 722, the memo line was blank, while on Plaintiffs' copy, the memo line reads: "July / August - 1000 for Roof)". Vooys did not have copies of receipts for the repairs done by Raycon Mechanical to the roof after the fire, or for repairs done by a plumber for the bathroom. She reiterated that both repairs were approved by Hanley and denied adding the notations on the memo lines to make it look like rent was current. Vooys explained on cross examination that she only added to, or revised, the checks' memo lines for record-keeping purposes, explaining that she "wouldn't just write a weird number . . . rent check for a weird number." (Trial Tr. 361:25-362:1.) Vooys conceded on redirect examination that she was not good

about keeping receipts and that Gerace was "[e]ven worse." *Id.* at 370:15.

¶23    On direct and cross-examination, Hanley disputed that Chrismos would have agreed to pay for plumbing repairs but agreed that Chrismos would have paid for repairs to the Beach Bar's grease trap. He assumed that the $921.00 rent check (#544) was for the grease trap repairs. But when pressed why he did not object when the check for less than the full amount came without a receipt, he explained that he would have treated the check as a partial payment toward the rent. Chrismos never gave Plaintiffs receipts for rent or a statement showing a balance due. Hanley also admitted on cross-examination that he was mistaken when he testified that Vooys and Gerace paid rent late in October, November, and December of 2003, and January and February of 2004. Mosler also confirmed that he and Hanley "always acted in the capacity as members of Chrismos." *Id.* at 714:18-19.

¶24    After Plaintiffs rested, Defendants moved for judgment as a matter of law on all counts. As to Count V (breach of an agreement to enter into a lease), Defendants claimed that Vooys and Gerace failed to present any evidence that they incurred financial losses, as opposed to the company, Barabus, who owned and operated the Beach Bar. The Court denied the motion, finding a dispute of fact. Regarding Counts VII (fraud), VIII (misrepresentation), and X (intentional or negligent infliction of emotional distress), Defendants argued that all three claims were barred by the gist of the action doctrine, as adopted by *Pollara v. Chateau St. Croix, LLC*, Case No. SX-06-CV-423, 2016 V.I. LEXIS 49 / 2016 WL 2865874 (V.I. Super. Ct. May 3, 2016), which held that tort claims merge with contract claims when the dispute between the parties arises from a contract. Defendants also asserted a lack of evidence of fraud or intentional misrepresentation. Plaintiffs opposed, claiming Defendants waived gist of the action as an affirmative defense by not asserting it in their answers. The Court took the motion under advisement as to the tort claims. Mosler moved to dismiss Count VI (the defamation claims), contending that Plaintiffs thrust themselves into the limelight by being the first ones to go on the radio. The Court also took the

motion under advisement as to Count VI. As to Count IX (intentional or negligent infliction of emotional distress), Plaintiffs, after hearing Defendants' arguments, agreed that they did not carry their burden of proof and agreed to withdraw the claim. Lastly, Mosler and Hanley argued that all counts against them failed because they were shielded from individual liability by the Virgin Islands' limited liability company laws, specifically Title 13, Section 1303(a) of the Virgin Islands Code. Plaintiffs again objected, claiming Mosler and Hanley failed to allege the individual immunity of the members of a limited liability company as an affirmative defense. The Court took Defendants' statutory immunity argument under advisement as well.

¶25    Defendants renewed their motion after they presented their defense and rested, and Plaintiffs called one witness in rebuttal. Defendants' arguments after the close of all evidence largely mirrored their earlier arguments. However, Defendants also moved to dismiss Plaintiffs' allegations of mental anguish and emotional distress within their breach of an agreement to enter into a lease claim (Count V), arguing that damages of this sort were unavailable in a contract action. The Court also *sua sponte* removed Plaintiffs' libel claim, finding no evidence of libel. Defendants renewed their gist of the action claim but further argued that the fraud and misrepresentation counts were duplicative. Mosler and Hanley also renewed their statutory immunity claim as members of Chrismos, a limited liability company. In addition to renewing their argument that the evidence Plaintiffs presented was insufficient as to all their claims, Defendants also argued that Plaintiffs failed to present any evidence to support punitive damages, noting that "punitive damages aren't allowed for the contract[ claims]." (Trial Tr. 793:22-23.) Plaintiffs also moved for judgment as a matter of law on Chrismos's debt counterclaim for unpaid rent. The Court reserved ruling on both motions. After discussing the jury instructions and the verdict form, Plaintiffs informed the Court that they could only be awarded damages once whether for breach of contract, intentional misrepresentation, or breach of the duty of good faith and fair dealing.

¶26    After deliberating, the jury returned a verdict in Plaintiffs' favor, finding that Chrismos had an agreement with Plaintiffs and breached that agreement by not giving them a lease, finding that all three Defendants made intentional misrepresentations to Plaintiffs, and that all three Defendants also breached their duty of good faith and fair dealing to Plaintiffs. The jury awarded $100,000 to Plaintiffs in damages. The jury also found that Mosler and Hanley had defamed Gerace and Vooys and separately awarded Gerace and Vooys $30,000 apiece from each defendant. Lastly, the jury found that Mosler and Hanley's actions warranted punitive damages and awarded Vooys $50,000 apiece from Mosler and Hanley. Defendants renewed their motion for judgment as a matter of law and also moved for a new trial based on statements made by Plaintiffs' counsel during closing arguments, which Defendants contend were prejudicial.

## II. MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Legal Standard

¶27    "A party is entitled to judgment as a matter of law when, in considering all of the evidence, accepting the nonmoving party's evidence as true, and drawing all reasonable inferences in favor of the nonmoving party, the court concludes that a reasonable jury could only enter judgment in favor of the moving party." *Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 409 (2016). "'In performing this narrow inquiry, trial courts and appellate courts must refrain from weighing the evidence, determining the credibility of witnesses, or substituting their own version of the facts for that of the jury.'" *Id.* (brackets omitted) (quoting *Chestnut v. Goodman*, 59 V.I. 467, 475 (2013)). "'Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability.'" *Chestnut*, 59 V.I. at 475 (quoting *Corriette v. Morales*, 50 V.I. 202, 205 (2008) (*per curiam*)). Instead, "'[a] motion for judgment as a matter of law should be granted only when viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference,

there is insufficient evidence from which a jury reasonably could find liability.'" *Id.* (brackets omitted) (quoting *Corriette*, 50 V.I. at 205).

### B. Discussion

¶28    Before turning to the parties' arguments, the Court first must note some preliminary points. In addition to the claims against the Bentley Defendants, Plaintiffs also asserted one count against Chrismos, which counsel continuously referred to as a breach of contact claim, even though the complaint stated the claim as being for breach of an agreement to enter into a lease. The remaining counts—defamation, fraud, misrepresentation, intentional or negligent infliction of emotional distress, and breach of the duty of good faith and fair dealing—were asserted against all three Chrismos Defendants. After Plaintiffs rested and Defendants moved for judgment as a matter of law, Plaintiffs withdrew Count IX, intentional or negligent infliction of emotional distress. Thus, the Court must enter judgment in favor of Chrismos, Mosler, and Hanley as to Count IX.

¶29    Additionally, after both sides had rested and Defendants renewed their motion for judgment as a matter of law, Defendants raised a new argument, that Plaintiffs' fraud and misrepresentation claims were duplicative. (*See* Trial Tr. 778:2-5 ("And we respectfully submit those are the same counts and there's no separate count under Virgin Islands [law] for fraud and for misrepresentation. It's the same count.").) Plaintiffs initially disagreed. However, after reviewing the proposed jury instructions and hearing the arguments of Defendants' counsel, Plaintiffs' counsel agreed that the damages were the same. *See generally id.* 824:16-826:7; *see also id.* at 837:1-7 ("MS. ROHN: Your Honor, if you'll recall earlier, I said you can take out 'fraud' and put in 'intentional misrepresentation.' So we don't intend to have a jury instruction on fraud because we are doing intentional misrepresentation because I agree with Attorney Holt that they're both – that the damages are the same."). As Plaintiffs consented either to the dismissal of their fraud count, or its merger with their misrepresentation count, and because the jury was not

instructed on the fraud count, the Court also must enter judgment in favor of Defendants as to Count VII.

### i. Gist of the Action Doctrine and Immunity of Individual LLC Members

¶30    In their motion for judgment as a matter of law, Defendants incorporate their prior arguments regarding the gist of the action doctrine, which they first raised after the Plaintiffs had rested and then renewed at the close of all evidence. They also incorporate their prior arguments regarding the immunity of Mosler and Hanley under Title 13, Section 1303 of the Virgin Islands Code, as members of Chrismos, a limited liability company (hereinafter "LLC"). Plaintiffs' response to both arguments is the same – the gist of the action doctrine and the immunity of individual LLC members are affirmative defenses that are waived. (*See generally* Trial Tr. 795:4-9 ("Even if not waived, the general rule of officers, directors and shareholder liability is that an officer or director of a corporation who takes part in the commission of a tort by the corporation is personally liable for resulting injuries."); *id.* at 796:3-5 ("As to the gist of the action argument . . . that defense has been waived.").) As both arguments raise unsettled questions of law, and do not necessarily concern the evidence admitted at trial, the Court will address these questions first.

¶31    Contrary to Plaintiffs' assertions, not every defense is affirmative. "A defense which demonstrates that plaintiff has not met its burden of proof as to an element plaintiff is required to prove is not an affirmative defense." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) (citing *In re: Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988)). Defenses that attack the plaintiff's complaint are called negative defenses. (*Cf.* Trial Tr. 783:16 ("[W]e would call them negative defenses . . . .").) "A negative defense is an attack on the plaintiff's prima facie case, for example, a defense of no causation to a negligence claim. As one court put it, a negative defense is the equivalent of a defendant saying, I did not do it." Hon. Amy St. Eve & Michael A. Zuckerman, *The Forgotten Pleading*, 7 Fed. Cts. L. Rev. 152, 160 (2013) (internal quotation marks, footnotes, and footnoted citations omitted). "Indeed, it is well settled that 'a defense which points out a defect in the prima facie case is not an

affirmative defense.' These defenses are sometimes referred to as 'negative' defenses because they are simply an attack on a party's prima facie case." *Gomez v. Bird Auto., LLC*, 411 F. Supp. 3d 1332, 1339 (S.D. Fla. 2019) (brackets, ellipsis, and citations omitted).

¶32     "Unlike a negative defense, an 'affirmative defense is one that admits the allegations in the complaint, but seeks to avoid liability, in whole or in part, by new allegations of excuse, justification, or other negating matter.'" St. Eve, *et al.*, *The Forgotten Pleading*, 7 Fed. Cts. L. Rev. at 160 (footnoted citation omitted). "As one court explained, a 'true affirmative defense raises matters outside the scope of plaintiff's prima facie case and such matter is not raised by a negative defense.'" *Id.* at 161 (footnoted citation omitted). "The modern concept of the affirmative defense is 'derived from the common law plea of 'confession and avoidance.'"'" *Id.* (footnoted citation omitted). Thus, an "affirmative defense . . . 'admits that the plaintiff has a claim (the "confession") but asserts some legal reason why the plaintiff cannot have any recovery on that claim (the "avoidance").'" *Baraby v. Swords*, 851 N.E.2d 559, 571 (Ohio Ct. App. 2006) (quoting *Eulrich v. Weaver Bros.*, 846 N.E.2d 542, 546 (Ohio Ct. App. 2005)). The statute of limitations is a quintessential example of an affirmative defense because the defendant who asserts it admits, or confesses, to the truth of the plaintiff's claim, but seeks to avoid liability because the plaintiff delayed too long in bringing that claim to court. So too with other affirmative defenses such as *res judicata* or worker's compensation. All affirmative defenses concede the truth of the plaintiff's allegations but avoid liability for that claim based on facts not stated in the complaint. *See In re: Top Flight Stairs & Rails, Ltd.*, 398 B.R. 321, 325 (Bankr. N.D. Ill. 2008) ("An affirmative defense 'requires a responding party to *admit* a complaint's allegations but then assert that for some legal reason the responding party is nonetheless excused from liability.'" (brackets and ellipsis omitted) (quoting *Reis Robotics USA, Inc. v. Concept Indus.*, 462 F. Supp. 2d 897, 906 (N.D. Ill. 2006))).

¶33     "Identifying whether a defense is negative or affirmative is often easy." St. Eve, *et al.*, *The*

*Forgotten Pleading*, 7 Fed. Cts. L. Rev. at 161. Negative defenses do not have to be pled in an answer. *See id.* at 164 ("In contrast to affirmative defenses, negative defenses need not be affirmatively pleaded in the answer. Courts do not read the word 'defenses' in Rule 8(b)(1) as extending to negative defenses. Because a negative defense is an attack on the prima facie case—and not a separate defense to prove at trial—the plaintiff presumably already has sufficient notice of the basis for the negative defense, and the reasons underlying the requirement of pleading fall away." (footnotes omitted)). Failure to state a claim for relief is an example of a negative defense that does not have to be pled in an answer. *See, e.g., Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134, 1143-44 (D. Or. 2018) ("'Failure to state a claim' is a negative defense that merely argues that plaintiff has not met its burden in establishing one or more elements of a claim, whatever that burden may be at a given stage of litigation."). Affirmative defenses must be alleged in an answer because they raise matters not alleged in the complaint.

¶34    "Although sometimes difficult to discern, the distinction between the two categories of defenses is crucial since affirmative defenses are generally waived if not plead." *Ford Motor Co. v. Transp. Indem. Co.*, 795 F.2d 538, 546 (6th Cir. 1986); *accord Coastal Air Transp. v. Royer*, 64 V.I. 645, 658 (2016) ("[A]ffirmative defenses are waived if not raised at the first opportunity in the Superior Court[.]") (citation omitted). Courts ask first whether the defense admits or denies the allegations in the complaint. Defenses that deny the complaint's allegations are negative or general defenses. Defenses that seek to avoid liability for reasons not stated in the complaint are affirmative defenses. "In determining whether a defense is an affirmative one, the starting point should be the list of affirmative defenses in Rule 8(c). A defense analogous to or a derivative of one of the listed defenses should generally be deemed an affirmative defense." *Ford Motor Co.*, 795 F.2d at 546; *accord Whyte v. Bockino*, 69 V.I. 749, 754-55 (2018) (courts look first to the plain language of Rule 8(c)(1) of the Virgin Islands Rules of Civil Procedure in reviewing affirmative defenses).

¶35    Neither the gist of the action doctrine nor Title 13, Section 1303 of the Virgin Islands Code are among the enumerated defenses listed in Rule 8(c) of the Virgin Islands Rules of Civil Procedure. That does not end the Court's inquiry, however. Instead, the Court must consider whether each defense admits to the allegations in the complaint or raises matters outside the complaint. If the defense merely denies the allegations in the complaint, it would be a negative defense and need not be listed in Rule 8(c). Plaintiffs would be mistaken in asserting that Defendants waived the defense in that instance. However, if the defense requires proof of facts not alleged in the complaint, it would be affirmative, and the next question would be whether the defense is analogous or derivative of another affirmative defense.

¶36    Turning first to Mosler and Hanley's claim of their statutory immunity of individual LLC members, Section 1303 of Title 13 of the Virgin Islands Code does provide that "[a] member or manager is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager." 13 V.I.C. § 1303(a). Additionally, "[t]he failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the company." *Id.* § 1303(b). LLC members may be liable in their capacity as members if provided in the articles of organization and the member consents in writing. *See generally id.* § 1303(c).

¶37    Clearly, the statutory immunity of an LLC member is an affirmative defense. The members of an LLC, and whether the consented to individual liability, will generally require proof of facts outside the complaint. As a form of immunity provide by statute it is analogous to the worker's compensation affirmative defense. Additionally, several courts in other jurisdictions have also held that the statutory immunity of individual LLC members is an affirmative defense. *See, e.g., Philp v. SE. Enterps., LLC*, No. M2016-02046-COA-R3-CV, 2018 WL 801663, *15 (Tenn. Ct. App. Feb. 9, 2018) ("[Tennessee statutes]

provide limited liability to members, managers and agents of a limited liability company. As such, the statutes are affirmative defenses that must be pled in accordance with Tennessee Rule of Civil Procedure 8.03."); *Baraby*, 851 N.E.2d at ("We find the protection against individual liability afforded to members and managers of a limited liability company is an affirmative defense."); *Klaus v. United Equity, Inc.*, 2010-Ohio-3549, ¶ 27 ("The plain language of R.C. 1705.48 assumes the existence of a valid claim (the 'confession') by using the terms 'debts,' 'obligations,' and 'liabilities,' as well as 'judgment,' 'decree,' or 'order of a court.' The statute, then, provides 'the avoidance' by specifically exempting members and managers of limited liability companies from personal liability on these assumed, valid claims against the limited liability company. As such, the statute provides an affirmative defense, by definition, as we found in *Baraby*."); *accord Downing v. Goldman Phipps PLLC*, No. 4:13-CV-206 CDP, 2017 U.S. Dist. LEXIS 39408, *18-19 (E.D. Mo. Mar. 20, 2017) (referring to immunity of individual member of former professional limited liability company as an affirmative defense); *Lieberman v. Mossbrook*, 208 P.3d 1296, 1312-13 (Wy. 2009) (referring to assertion that individual members were not proper parties as an affirmative defense and reversing imposition of individual liability and remand for correction of judgment to name LLC as defendant); *see also Keller Williams Consultants Realty v. Trio Custom Homes, Ltd.*, No. 12 CVH-09-11908, 2013 Ohio Misc. LEXIS 10959, *32 (Ohio Ct. Com. Pl. Dec. 23, 2013) (finding defendant adequately raised lack of personal liability by moving to amend answer to allege he was acting as member of LLC at all times). *Cf. Joe Hand Promotions v. Davis*, No. C 11-6166 CW, 2012 U.S. Dist. LEXIS 145402, *9-10, *18-20 (N.D. Cal. Oct. 9, 2012) (referring to individual LLC member immunity affirmative defense as failure to join an indispensable party or failure to state a claim);

¶38    "A limited liability company (LLC) is a hybrid of two basic business entities. It 'combines the organizational flexibility and pass-through tax treatment of a partnership with the limited liability protection of a corporation.'" *Shelter Mortg. Corp. v. Castle Mortg. Co., L.C.*, 117 F. App'x 6, 13 (10th

Cir. 2004) (quoting 1A William Meade Fletcher, et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 70.50 (perm. ed. 2002)). Mosler and Hanley were entitled to claim the limited liability protection of Chrismos as its members. They did not. First, in the answer that Mosler and Chrismos filed on July 12, 2005, did not assert the statutory LLC immunity of Mosler as an affirmative defense. In fact, Mosler did not assert any affirmative defenses since their answer clearly provided that "Chrismos Cane Bay, LLC hereby asserts the following affirmative defenses . . . ." (Ans. 5, filed July 12, 2005.) The Answer does not define both Mosler and Chrismos as "Chrismos" and the language just quoted is written in the singular tense: Chrismos "asserts", not Chrismos and Mosler "assert." Since Mosler did not assert any affirmative defenses, he clearly waived the LLC member immunity defense. So did Hanley. His answer, filed separately from the answer filed jointly by Mosler and Chrismos, asserted the same affirmative defenses as Chrismos. Section 1303 immunity belongs to the members, not the LLC. Hanley did not assert it either. Thus, Plaintiffs are correct that Mosler and Hanley waived the affirmative defense of the statutory immunity afforded LLC members by waiting until the close of the Plaintiffs' case in chief to raise it. *See Coastal Air Transp.*, 64 V.I. at 658.

¶39 As for the gist of the action doctrine, it is clear that Plaintiffs are mistaken, the gist of the action doctrine is a negative defense. "The gist of the action doctrine is a theory under common law 'designed to maintain the conceptual distinction between breach of contract claims and tort claims.' The doctrine is policy-based, arising out of the concern that tort recovery should not be permitted for contractual breaches." *Addie v. Kjaer*, 60 V.I. 881, 897-98 (3d Cir. 2013) (citation omitted). The gist of the action doctrine is a negative defense because it does not require proof of any fact not already alleged in the plaintiff's complaint. Instead, the defendant asserting the gist of the action doctrine contends that the complaint alleges a contractual relationship between the plaintiff and the defendant and tort claims are not permitted. Instead, the plaintiff is limited to whatever rights the parties agreed to in their contact. However,

contrary to what Defendants represented during oral argument, the Supreme Court of the Virgin Islands

has not recognized the gist of the action doctrine yet.[4,5] Thus, a *Banks* analysis would be necessary.

*Cf. Pollara*, 2016 V.I. LEXIS 49 at *11 ("Because this common law gist of the action doctrine is not the

subject of any binding precedent, we perform an analysis pursuant to *Banks v. Intl Rental & Leasing Corp.*,

55 V.I. 967 (2011) to determine whether the doctrine applies in the Virgin Islands.").

¶40    In this instance, however, the Court declines to conduct a *Banks* analysis. Gerace and Vooys doing

business as the Cane Bay Beach Bar were commercial tenants and Chrismos was their landlord. As other

courts have explained, "[t]he existence of a landlord-tenant relation is contractual in nature and may be

express or implied. Such a relationship can arise from the conduct of the parties and may be implied even

---

[4] Defendants' counsel represented multiple times that the Supreme Court of the Virgin Islands had recognized the gist of the action doctrine in *Pollara*. (*See* Trial Tr. 572:14-22 ("Your Honor, under the Supreme Court holding in *Pollara versus Chateau St. Croix* . . . this jurisdiction recognizes the gist of the action [d]octrine which states that if there is a contract claim, it can't be turned into a tort claim. And in particular, our Supreme Court adopted the gist of the doctrine as the law in the Virgin Islands after doing a *Banks* analysis.").) *Pollara* is not binding. It was decided by a Superior Court judge. There is a *Pollara* decision issued by the Virgin Islands Supreme Court, *Pollara v. Chateau St. Croix, LLC*, 58 V.I. 455 (2013), but that decision was issued three years prior to the gist of the action *Pollara* decision. There is also a *Pollara* decision by the United States Court of Appeals for the Third Circuit, *see Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 62 V.I. 758 (3d Cir. 2015), which does contend that the Virgin Islands Supreme Court has adopted the gist of the action doctrine. *See id.* at 769 n.11. However, as discussed in the following footnote, that contention was mistaken.

[5] In *Frank C. Pollara Group, LLC v. Ocean View Investment Holding, LLC*, 62 V.I. 759, 769 n.11 (3d Cir. 2015), the United States Court of Appeals for the Third Circuit rejected a request by the appellants "to hold that the gist-of-the-action doctrine does not apply under the law of the Virgin Islands." The Third Circuit rejected that request for two reasons. First, the court had previously held in *Addie*, 60 V.I. at 899, "that the doctrine is applicable in the Virgin Islands." Only the full appellate court sitting en banc could have overruled Addie. But the second, and more troubling, reason the Third Circuit gave for not revisiting *Addie* is because "the Supreme Court of the Virgin Islands has recently held that the gist-of-the-action (or barred-by-contract) doctrine does apply in the Virgin Islands." *Frank C. Pollara Grp., LLC*, 62 V.I. at 769 n.11 (citing *Cacciamani & Rover Corp. v. Banco Popular de P.R.*, S. Ct. Civ. No. 2013-0063, 2014 WL 4262098, *3 (V.I. Aug. 29, 2014)). *Cacciamani and Rover Corporation* did recognize the barred-by-contract doctrine. *See Cacciamani & Rover Corp. v. Banco Popular de P.R.*, 61 V.I. 247, 253 (2014). Some of the reasoning behind *Cacciamani and Rover Corporation* could also be persuasive when analyzing the gist of the action doctrine. *Cf. id.* ("It is clearly the sounder rule to hold the parties to a contract to the terms of their agreement and the legal remedies provided for a breach of those terms . . . ."). But the question in *Cacciamani and Rover Corporation* was not whether tort claims should be barred when the relationships between the parties is based on a contract. Instead, the question was whether parties could seek relief unjust enrichment rather than the contract they entered into. *See id.* ("'Parties entering into a contract assume certain risks with the expectation of a beneficial return; however, when such expectations are not realized, they may not turn to a quasi-contract theory for recovery.'" (quoting *Balter, Capitel & Schwartz v. Tapanes*, 517 N.E.2d 1216, 1219 (Ill. 1987), parenthetically))). This Court has not found any decision other than *Frank C. Pollara Group, LLC* that equates the barred by contract doctrine with the gist of the-action doctrine. The Third Circuit was mistaken; the Supreme Court of the Virgin Islands has not held that the gist of the action doctrine applies in the Virgin Islands.

in the absence of a written agreement under certain circumstances." *WG Assocs. v. Estate of Roman*, 753 A.2d 1236, 1238 (N.J. Super. Ct. App. Div. 2000) (citations omitted); *Schuman v. Kobets*, 716 N.E.2d 355, 356 (Ind. 1999) ("Since a lease is a contract, the essence of the landlord-tenant relationship is contractual in nature."). *See also, e.g., Shwachman v. Davis Radio Corp.*, No. 93-01912, 1994 Mass. Super. LEXIS 710, *7 (Mass. Super. Ct. July 1, 1994) ("Originally at common law, a lease agreement created a property relationship between the landlord and tenant. Today, however, the landlord-tenant relationship is viewed as contractual in nature wherein the landlord promises to deliver and maintain the premises in a habitable condition and the tenant promises to pay rent for the use thereof. While a warranty of habitability is implied in residential leases, "no such warranty may be implied in the rental of commercial property."" (citations and footnote omitted)). *Accord* 28 V.I.C. § 242 (referring to contracts for lease of land). *But cf. Nicholas v. Howard*, 459 A.2d 1039, 1040 (D.C. 1983) ("A landlord-tenant relationship does not arise by mere occupancy of the premises; absent an express or implied contractual agreement, with both privity of estate and privity of contract, the occupier is in adverse possession as a 'squatter.'").

¶41    Chrismos inherited the Dive Shop and the Beach Bar tenants when it purchased the property from the former owner. Although Virgin Islands law is unclear on the effect of the sale of real property, residential or commercial, where tenants are in possession at the time of the conveyance, *but cf.* 28 V.I.C. § 752, other jurisdictions have held that a conveyance of a commercial property terminates the tenancy of the tenants. *See, e.g., Farris v. Hershfield*, 89 N.E.2d 636, 637 (Mass. 1950) (explaining that "tenancy at will . . . terminated with the conveyance of the land" "[s]ince the premises were not occupied for dwelling purposes . . . ."); *Irving Oil Corp. v. Me. Aviation Corp.*, 704 A.2d 872, 874 (Me. 1998) ("A tenancy at will . . . cannot be conveyed or assigned; it does not pass with the alienation of the underlying estate. When title to property occupied by a tenant at will is passed by deed or lease, the tenancy is terminated,

and the tenant becomes a tenant at sufferance." (citations omitted)). The evidence clearly showed that the Beach Bar did not have a lease. The Bentley Defendants did not have a lease to sell to Gerace and Vooys and Gerace and Vooys, or Barabus, the company they formed to buy the Beach Bar business. And Vooys and Gerace repeatedly requested a lease from Mosler and Hanley. The fact that they did not have a lease is, after all, what this case is about. Vooys and Gerace were still tenants of Chrismos, in a month-to-month tenancy. Even if the Court were to conclude that the soundest rule for the Virgin Islands is to recognize the gist of the action doctrine, it would not matter here because Plaintiffs and the Chrismos Defendants were not parties to any contract at issue. The gist of the action doctrine might have barred the fraud (Count II) and misrepresentation (Count III) counts Plaintiffs asserted against the Bentley Defendants because Plaintiffs and the Bentley Defendants did sign a contract, the July 1, 2003 asset purchase agreement that Plaintiffs attached to their complaint. If the Bentley Defendants had moved to dismiss for failure to state a claim for relief based on the gist of the action doctrine it might have been sound to "hold the parties . . . to the terms of their agreement and the legal remedies provided for a breach of those terms, and to reserve . . . [tort claims] for those instances where there is no contract and other legal remedies are unavailable." *Cacciamani & Rover Corp.*, 61 V.I. at 253.

¶42     Here, Gerace and Vooys were tenants of Chrismos, but the claims they asserted in this action did not arise out of that tenancy. In other words, the gist of the action Vooys and Gerace brought against the Chrismos Defendants has nothing to do with the rent they paid each month or the duties the law imposes on commercial landlords. There was a contractual relationship between Chrismos and Gerace and Vooys, the landlord-tenant relationship. But that relationship was not the gravamen of this action and Defendants repeatedly denied having entered into any agreement with Plaintiffs other than a month-to-month tenancy. Instead, it was the request to enter into a new and long-term landlord-tenant relationship that is the gist of this action. "In some instances, 'it is possible that a breach of contract also gives rise to an actionable tort.

To be construed as in tort, however, the wrong ascribed to the defendant must be the gist of the action, the contract being collateral.'" *Howe v. LC Philly, LLC,* No. 10-5495, 2011 U.S. Dist. LEXIS 41534, *10 (E.D. Pa. Apr. 15, 2011) (quoting *Etoll, Inc. v. Elias/Savion Adver., Inc.,* 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). Here, the month-to-month tenancy, a contract implied in fact through the actions of the parties, is collateral to the wrongs Plaintiffs complained of, namely the time, money, energy, and passion they invested into the Beach Bar under the expectation that they would be given a lease. The contract that existed between the parties, the month-to-month tenancy, is collateral to that claim and, for this reason, the Court finds it unnecessary to determine whether Virgin Islands common law should recognize the gist of the action doctrine. Even if the negative defense were recognized in the Virgin Islands, it would not apply here.

## ii. The "Contract" Claims

¶43    Defendants move for judgment as a matter of law on three of Plaintiffs' claims, which they refer to collectively as the "contract" claims. (*See* Defs.' Post-Trial R. 50(b) & R. 59(a) Mot. 2, filed Mar. 22, 2022 ("The jury verdict form included three similar counts—one for breach of contract, one for intentional misrepresentation and one for breach of the duty of good faith and fair dealing (hereinafter collectively referred to as the "contract" claims)." (bold font omitted)).) Having reviewed all three claims, the Court agrees that it must set aside the jury's verdict as to the breach of contract claim and the breach of the duty of good faith and fair dealing. Both claims presume the existence of an agreement between the parties which the evidence did not show. The Court will uphold the jury's verdict as to intentional misrepresentation, however.

¶44    Count V of the Complaint alleged that Chrismos breached an agreement with Plaintiffs to enter into a lease. "There is a marked distinction in both the rights and liabilities of the parties between a lease and a mere agreement for a lease. The question whether an agreement is a lease or an agreement for a

lease depends upon the intent of the parties . . . ." *Kilbride v. Wilson*, 8 V.I. 129, 133 (Mun. Ct. 1970) (citation omitted). "If parties intend that an agreement be one of leasing, it so operates notwithstanding a written formal lease is to be later executed. On the other hand, if they intend that an agreement should be as finally evidenced by a written lease, there is only an agreement for a lease." *Engle v. Heier*, 173 N.W.2d 454, 456 (S.D. 1970) (citation omitted). As the court in *Engle* explained:

> To be binding, an agreement for a lease must be certain as to the terms of the future lease. If it appears that any of the terms of the future lease are left open to be settled by future negotiation between the lessor and lessee "there is no complete agreement; the minds of the parties have not fully met . . . .'" *Id.* (quoting *Cypert v. Holmes*, 299 P.2d 650, 651 (Ariz. 1956)).

¶45    Count X of the Complaint alleged that the Chrismos Defendants breached their duty of good faith and fair dealing. "'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.'" *Basic Servs., Inc. v. Gov't of the V.I.*, 71 V.I. 652, 660 (2019) (citation omitted). In fact, "the implied duty of good faith and fair dealing arises by implication through the existence of a contract itself." *Chapman v. Cornwall*, 58 V.I. 431, 441 (2013). Although the Virgin Islands Supreme Court has not held that the existence of a contract—or a factual dispute for the jury to resolve as to whether a contract existed—is a prerequisite to asserting this claim, courts in the Virgin Islands and elsewhere agree: "there can be no claim for breach of good faith and fair dealing when there is no contract to which such obligation attaches." *Geesey v. CitiMortgage, Inc.*, 135 F. Supp. 3d 332, 347 (W.D. Pa. 2015) (applying Pennsylvania law); *see also Estate of Burnett v. Kazi Foods of the V.I.*, 69 V.I. 50, 61 (Super. Ct. 2016) ("[T]he covenant of good faith and fair dealing is imposed upon parties by virtue of the existence of a contract."); *Webster v. CBI Acquisitions, LLC*, No. ST-11-CV-558, 2012 V.I. LEXIS 9, *9 (V.I. Super. Ct. Mar. 5, 2012) ("Plaintiff may not allege a claim for breach of the duty of good faith and fair dealing absent a contractual relationship."); *accord Macklin v. CitiMortgage, Inc.*, 2015-Ohio-97, ¶ 14 (Ct. App.) ("The covenant of good faith and fair dealing is part of a contract claim and does not stand

alone as a separate claim from breach of contract." (citing *Lakota Local Sch. Dist. Bd. of Educ. v. Brickner*, 671 N.E.2d 578, 583-84 (Ohio Ct. App. 1996)); *Young v. Allstate Ins. Co.*, 198 P.3d 666, 691 (Haw. 2008) ("Absent a contract . . . [the] claim for breach of the assumed duty of good faith and fair dealing must fail."); *Beukas v. Bd. of Trs. of Fairleigh Dickinson Univ.*, 605 A.2d 776, 783 n.4 (N.J. Super. Ct. 1991) ("It is widely acknowledged that absent a contract, there can be no breach of the implied covenant of good faith and fair dealing." (citing *Noye v. Hoffmann-La Roche*, 570 A.2d 12 (N.J. App. Div. 1990)).

¶46    The evidence clearly shows that there was no agreement. Without an agreement, there is no contract and without a contract there can be no breach. *Cf. Coastal Air Transp. v. Lockhart*, 73 V.I. 672, 677 n.5 (2020) ("To establish a breach of contract claim, the Plaintiff must show '(1) an agreement; (2) a duty created by that agreement; (3) a breach of that duty; and (4) damages.'" (quoting *Phillip v. Marsh-Monsanto*, 66 V.I. 612, 621 (2017)). Vooys testified that when she and Gerace first discussed a seven-year lease with Mosler and Hanley, either Mosler or Hanley "said that that seemed . . . reasonable. We would work on that and we'd get one, you know. *We'd talk more about it.*" (Trial Tr. 175:10-12 (emphasis added).) Vooys's own testimony shows that the four agreed to talk more about the terms of the lease. "Ordinarily, where the parties contemplate the further negotiation and execution of a formal instrument, a preliminary agreement does not create a binding contract . . . ." *Citadel Broad. Co. v. Renaissance 632 Broadway, LLC*, 2010 NY Slip Op 31482(U), ¶ 9 (Sup. Ct.)).

¶47    Either Mosler or Hanley, on behalf of Chrismos, eventually did give Vooys and Gerace a lease, but it was a two-year lease, not a seven-year lease. Vooys testified that it was a "horrible" lease, and she voiced her disagreement with to Hanley. He agreed, according to her, and said they would work on it. Then the kitchen fire occurred and Vooys and Gerace expressed their reservations to Mosler and Hanley about investing further in the business without the security of a long-term lease. Mosler, according to Vooys, wanted them to get back on their feet first before discussing the terms of the lease. A second lease

was offered, but Vooys said it did not differ much from the first. Vooys and Gerace went to Attorney Groner, but they never followed up with him.

¶48    This evidence shows on-going negotiations between the parties but also that Chrismos, through Mosler and Hanley, did, in fact, offer Plaintiffs a lease, just not the lease they wanted. Even if there had been a preliminary agreement, which Vooys's own testimony contradicts, the parties' negotiations clearly show no agreement. When viewing all the evidence in the light most favorable to Plaintiffs, as the nonmoving parties, the Court cannot find sufficient evidence of an agreement. A "scintilla" is not enough. *See Chestnut*, 59 V.I. at 475. There was no certainty over the terms of the lease, apart from the parties' dispute as to the length. Vooys testified that the initial proposed lease was in Gerace's name, while the later lease was in the name of Barabus. The initial lease had Gerace waiving his right to a jury trial and indemnifying Chrismos. The amount of rent to be paid each month was not settled, with the initial lease increasing rent to $2,000 a month and the revised version leaving rent at $1,500 a month but eventually increasing it to $2,500. Clearly there was no meeting of the minds as to any of the terms of a lease for the Beach Bar. As a result, the Court must grant Defendants' motion to set aside the jury's verdict as to Counts V (breach of contract / agreement to enter into a lease), and Count X (breach of the duty of good faith and fair dealing). Both counts fail because there was no agreement.

¶49    The evidence was sufficient, however, for a reasonable jury to find the Chrismos Defendants liable on Count VIII (misrepresentation). As noted, Plaintiffs essentially agreed to the dismissal of their fraud claim as duplicative of their intentional misrepresentation claim. In instructing the jury, the Court relied on the decision of the Supreme Court of the Virgin Islands in *Love Peace v. Banco Popular de Puerto Rico*, 75 V.I. 284 (2021). In *Love Peace*, the Virgin Islands Supreme Court explained that misrepresentation claims can sound both in contract and in tort. "[W]here a claimant seeks only to rescind an underlying contract based on an alleged misrepresentation, entitlement to that relief is determined

according to the law of contracts . . . ." *Id.* at 289. "[W]here the claimant seeks damages arising from the misrepresentation, such a claim sounds in torts, rather than contracts." *Id.* The Court has already determined that there was no agreement between Plaintiffs and the Chrismos Defendants. Thus, Plaintiffs' misrepresentation claim sounds in tort. The elements of an intentional misrepresentation claim are:[6] (1) that a material fact, opinion, intention, or law was misrepresented; (2) that the person making the misrepresentation knew or had reason to believe it was false; (3) that the misrepresentation was made for the purpose of inducing another to act or refrain from acting; (4) that the other person justifiably relied on the misrepresentation; and (5) that the other person suffered a pecuniary loss. *See id.* at 291.

¶50    Mosler and Hanley told Vooys and Gerace they would talk more about a lease and then gave them a list of improvements they wanted done to the restaurant. Gerace's brother, Edward, corroborated the testimony that Mosler and Hanley had conditions for getting lease and so did Reed, the longtime bartender of the Beach Bar. (*See* Trial Tr. 512:4-9 ("It lasted – well, it lasted until they were gone. I mean they – they never got a lease. And – and – and each time they were promised one, they had certain more things they had to do; and when they were getting these things done, they still hadn't gotten a lease.").) Conditioning improvements to the property to get a lease continued after the fire. According to Vooys, Mosler said "[t]hey wanted to wait until we fixed everything and got up and running and then we'd talk

---

[6] Although Plaintiffs characterized their misrepresentation claim as being for intentional misrepresentation, courts in other jurisdictions have recognized that fraudulent misrepresentation and intentional misrepresentation are the same. *See, e.g., Thompson v. Bank of Am., N.A.,* 773 F.3d 741, 751 (6th Cir. 2014) ("[T]he Tennessee Supreme Court explained that the terms 'intentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' all refer to the same tort, and expressed its preference for the term 'intentional misrepresentation.'" (citation omitted)); *Phila. Indem. Ins. Co. v. Ohana Control Sys.,* 289 F. Supp. 3d 1141, 1151 n.1 (D. Haw. 2018) ("The Hawaii Supreme Court has referred to intentional misrepresentation as interchangeable with fraudulent misrepresentation." (citing *Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. of Dirs. v. Venture 15, Inc.,* 167 P.3d 225, 256 (Haw. 2007)); *Kramer v. Petisi,* 940 A.2d 800, 806 n.9 (Conn. 2008) ("[A]t common law, fraudulent misrepresentation and intentional misrepresentation are the same tort."); *Doe 67C v. Archdiocese of Milwaukee,* 700 N.W.2d 180, 193 n.10 (Wis. 2005) ("'[W]e use "intentional misrepresentation," and "fraudulent misrepresentation," and "fraud" interchangeably.'" (citation omitted)). Since Plaintiffs withdrew their fraud claim, and since the Court instructed the jury based on the elements of fraudulent misrepresentation as provided in *Love Peace,* the Court assumes the Virgin Islands also views intentional misrepresentation and fraudulent misrepresentation as synonymous.

about . . . [a lease] again." *Id.* at 191:16-17. In his deposition, which was read to him during cross-examination, Mosler acknowledged that leases did not matter much to him. *See id.* at 739:7-11 ("I don't think it mattered much. Get the rent every month or you don't. If someone violates the lease, you can't go after anybody down here anyway so it didn't seem to be a big deal to me one way or the other."). He also testified that the short-term lease that he did offer

> would have been an improvement over what they already had. They were there on a month-to-month basis and they were there on a month-to-month basis before I got there where they could be asked any time to leave with 30 day's notice and lose their entire $80,000 purchase price. By having a two-year lease, they would at least have two more years. So it was an improvement over what they already had. And it was a draft lease, it was a proposal, to further negotiations. *Id.* at 723:19-724:3.

¶51 Having viewed the evidence in the light most favorable to the nonmoving party, the Court concludes that Plaintiffs clearly and convincingly established that Mosler and Hanley, and Chrismos through them, are liable for the tort of intentional misrepresentation. There is no dispute in the testimony that Vooys and Gerace wanted a long-term lease, seven-years according to them. What is disputed is whether Mosler and Hanley promised to give them a seven-year lease. The Court concluded above that the evidence does not support finding of a promise between the parties. But the evidence is undisputed that Vooys and Gerace asked for a long-term lease, that a Mosler and Hanley represented that it was a reasonable request, and they would talk more about it, but Vooys and Gerace had to make repairs to the Beach Bar first.

¶52 Viewing Vooys's testimony in the light most favorable to Plaintiffs, Mosler and Hanley, on behalf Chrismos, represented that they would give, or at least consider giving, Vooys and Gerace a long-term lease, knowing they had no intention to honor that representation. They made the representation to induce Vooys and Gerace into make repairs to the building Chrismos owned. Vooys and Gerace may have purchased the Beach Bar business, but the building in which that business operated was owned by

Chrismos. Mosler and Hanley did offer a lease, but they had to know that Vooys and Gerace would not have accepted that lease. By the time the first lease was offered in March 2004, Vooys and Gerace had been running the Beach Bar for approximately six months and made significant improvements to the building, including to the bathrooms and other parts of the structure. The March 2004 proposed lease would have required that Vooys and Gerace make all future repairs, pay the property taxes, obtain insurance and indemnify Chrismose, and pay the utilities. No mention was made of the Dive Shop or its responsibility for half of the utilities or for sharing in the payment of property taxes. The March 2004 proposed lease also did not give Vooys and Gerace a right to renew, but did Chrismos the right to show the property three months before the term ended and put "For Rent" signs up. (*See generally* Pls.' Ex. 7.)

¶53    A copy of the November 2004 proposed lease was not admitted into evidence, but the testimony established that it did not differ much from the March 2004 proposal and further, that Mosler and Hanley waited to offer another lease until after Gerace and Vooys had already invested a substantial amount of money to repair the building after the fire. If Gerace and Vooys had decided to rent another location for the Beach Bar after the fire or to give up the restaurant, Chrismos would have had to cover the cost of the repairs to the structure itself because the parties did not have a lease that specified responsibility for repairs and there was no security deposit in place; the proposed lease would have added that requirement. (*Cf.* Trial Tr. 657:10-11.) Further, even though Mosler said he did not care about leases, he and Hanley did not have an objection to a long-term lease because Chrismos gave Jordan a seven-year lease with an option to extend for another three years. Clearly, Vooys and Gerace suffered pecuniary loss when they repeatedly made repairs to a building owned by Chrismos and were then deprived of the benefits and use of those improvements. *Cf.* 28 V.I.C. § 436. For these reasons, the Court finds that Plaintiffs submitted sufficient evidence to support the jury's verdict as to Count VIII. Defendants' motion for judgment as a matter of

law will be denied and the award of $100,000 to Plaintiffs affirmed.[7,8]

### iii. Defamation

¶54    Mosler and Hanley move to set aside the jury's verdict finding them liable for defamation. As they

point out in their motion, Vooys was the primary witness who testified as to any defamatory statements.

No audio or video recording from the Roger Morgan show was presented at trial. Further, Christensen

testified only that she had heard about Mosler going on the radio and talking about the Beach Bar. She did

not testify as to what Mosler said and did not mention Hanley having been on the radio. Gerace was not

asked whether he heard Mosler or Hanley on the radio.

¶55    In *Joseph v. Daily News Publishing Company*, 57 V.I. 566 (2012), the Supreme Court of the Virgin

Islands established the elements of a defamation claim under Virgin Islands law:

> The first element is a false and defamatory statement concerning another. The truth

---

[7] The verdict form asked the jury to award damages but only if they found liability as to breach of an agreement to enter into a lease, intentional misrepresentation, or breach of the duty of good faith and fair dealing. In other words, one amount was to be awarded for any of the three counts. Although the Court will grant the motion for judgment as a matter of law as to the two contract claims, the Court must presume that the jury followed the instructions on the verdict form and concludes, therefore, that the $100,000 was awarded for the tort claim. Further, since the Court concludes that Plaintiffs asserted misrepresentation as a tort and not a contract claim, the damages the jury awarded were reasonable and the Court rejects Defendants' contrary arguments that the amount of Plaintiffs' loss had to be accounted for with mathematical precision.

[8] Defendants also argue, in essence, that any losses that might have been incurred were incurred by Barabus, Inc., the corporation Gerace formed. Plaintiffs' Exhibit 1 is an asset purchase agreement, effective July 1, 2003, between Gerace and CB3, Inc. Vooys testified that they closed on the sale of the Beach Bar on August 7, 2003, which is reflected on the signature page of the asset purchase agreement. Vooys's name does not appear in that agreement. Defense Exhibit 2 is a promissory note dated August 7, 2003, given by Gerace to Maria Bently as holder. Vooys name does not appear on the note. The articles of organization for Barabus, Inc., which is Defense Exhibit 5, is dated August 12, 2003. The incorporators were Gerace, June Davis, and Eileen des Jardin. Gerace was listed as president, Edward Gerace was vice-president, and Vooys was secretary and treasurer. None of documents pertaining to Barabus, which Defendants admitted at trial, show a transfer from Gerace to Barabus of his purchase of the Beach Bar from CB3, Inc., or an assignment or transfer of the promissory note to Barabus. The Barabus documents also do not show Vooys's financial interest in the business. She did not sign the promissory note or the asset purchase agreement and was listed simply as an officer of Barabus. But Vooys did testify that she provided some of the financing for the asset purchase. (*See generally* Trial Tr. 248:13-251:13.) And Vooys and Gerace are listed as the sellers on Plaintiffs' Exhibits 17 and 21, with Jordan listed as purchaser. Barabus, Inc. did not buy the Beach Bar from CB3, Inc., nor did Barabus, Inc. sell the Beach Bar to Jordan. When, or if, Vooys acquired a legal interest in the Beach Bar or Barabus, and what role Barabus played with respect to the claims Plaintiffs asserted should have been raised prior to trial. Furthermore, apart from challenging the evidence of the expenses Plaintiffs incurred, Defendants do not cite to any authority regarding the effect of claims brought by officers of a corporation instead of the corporation itself. Furthermore, persuasive authority recognizes that dismissal for misjoinder or is disfavored and proper parties can be substituted at any stage. *See generally Liberman*, 208 P.3d 1312-13, 1315 (affirming but finding error with trial court's disregard of corporate form and remanding for entry of amended judgment against company). Having considered Defendants arguments and objections, the Court finds no merit in them.

or falsity of a statement is generally a question of fact for the jury, and [a] statement or communication is only defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

The second element is an unprivileged publication to a third party. Publication means the communication intentionally or by negligent act to one other than the person defamed. There are two methods of publication: libel and slander. Libel is the [] publication of defamatory matter by written or printed words. Slander is the publication of defamatory matter by spoken words. The term unprivileged refers to the alleged defamer's inability to demonstrate that he was in some way privileged to make the defamatory communication. The types of privilege defenses available fall into two categories, absolute privileges, and conditional privileges. Privilege, however, can be abused in such a way as to subject to privileged defamer to liability despite his privilege.

The third element can generally be described as fault. The level of fault varies with the parties to the defamation action, but . . . the minimum standard . . . is[] fault amounting to at least negligence on the part of the publisher. It is the element of fault that is given a higher threshold when the defendant in a defamation action is a public official or public figure and the defamatory statements reference matters of public concern. In the case of a defendant who is not a public figure or official, the minimum standard applies, and the defendant need prove only that the publisher acted at least negligently in failing to ascertain whether the statements concerning the defendant were true or false.

The fourth element is either the actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. . . . [S]pecial harm [i]s the loss of something having economic or pecuniary value which must result from the conduct of a person other than the defamer or the one defamed and must be legally caused by the defamation. In essence, this element refers to two general categories of liability-producing statements. First, there are those that the Plaintiff is able to demonstrate caused him special harm. Second, there are those for which Plaintiff need not prove the existence of special harm because they are actionable on their face. This second category clearly begs the question, what makes a defamatory statement actionable on its face, or actionable *per se*? The answer to this question depends in part on whether the statement is either a libel or a slander. Specifically, oral defamation[,] i.e. slander[,] is tortious if the words spoken fall within a limited class of cases in which the words are actionable per se, or if they cause special damages. Written defamation[,] i.e. libel[,] is actionable *per se*. Thus, special damages need only be proven when the statement is slanderous and it does not fall into one of the limited classes of speech which is actionable *per se*. The classes of speech that are actionable *per se* are outlined in Restatement (Second) of Torts, §§ 570-574. *Id.* at 585-88 (quotation marks, brackets, ellipses, citations, and footnote omitted)

¶56     Contrary to Defendants' arguments, Vooys was not the only witness who testified to having heard

Mosler on the radio. Reed testified that he heard Mosler on the radio "saying that they [Vooys and Gerace]

didn't pay rent, that they – supposedly loud parties were there. I think they even mentioned something about drugs or something in that area on the radio. But it was always negative." (Trial Tr. 520:21-25.) Reed partially corroborated Vooys's testimony earlier in trial when she said she heard Mosler say on the radio "[t]hat he was getting rid of us because we didn't know what we were doing, we were always late on rent, we were behind on rent, we didn't know how to run a restaurant." *Id.* at 210:1-4. Counsel for Plaintiffs then testified, asking about the "accusation about the dogs in the restaurant, did you have dogs in your restaurant?" *Id.* at 210:7-8. Defendants did not object and Vooys acknowledged that there were dogs on the beach at Cane Bay but denied that there were dogs in the restaurant. The problem here is that only mention of dogs occurred shortly before when Vooys was testifying about the March 2005 conversation with Mosler where he expressed his disagreement with how they were running their business. *See id.* at 204:13-205:19. In other words, the jury never heard that Mosler said on the radio that the Beach Bar owners allowed dogs to be in the restaurant. Woodson denied seeing dogs in the restaurant, and no one asked him if he had heard it said on the radio that dogs were in the restaurant. Hanley testified that he saw dogs in the restaurant, but no one said they heard him, or Mosler, publish that statement on the radio.

¶57    Furthermore, no one testified to any defamatory statements allegedly made by Hanley. Counsel for Plaintiffs testified, saying "So when Mosler and Hanley started going on the radio and TV and essentially declaring you deadbeats, what happened to your clientele?" *Id.* at 227:12-14. And, to be sure, Hanley did admit to going on the radio to defend his reputation and character. *See id.* at 624:2-5. But only Hanley testified to any particular statement he, himself, made on the radio and those statements were made to counter Vooys's statements that they were current on the rent. Based on Hanley's testimony only, it was not possible for the jury to find that he defamed Gerace or Vooys.

¶58    As for Mosler, other than the comment about dogs in the restaurant, all of what Mosler supposedly said was either true or his opinion. "Whether an allegedly defamatory statement is one of opinion or fact

is . . . a question of law . . . ." *Simpson v. Andrew L. Capdeville, P.C.*, 64 V.I. 477, 486 (2016). Considering that Vooys and Gerace were running a business and that the allegedly defamatory statements concerned their fitness to run that business, the statements could be *per se* actionable, and damages would be presumed if they were, in fact, defamatory. *See Joseph*, 57 V.I. at 588 (citing *Restatement (Second) of Torts* §§ 570-74 (1977)).

¶59     Section 573 of the Restatement (Second) of Torts explains that "[o]ne who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business . . . is subject to liability without proof of special harm." However, because damages are presumed in defamation *per se* cases—and in some jurisdictions, punitive damages can be awarded without an award of any other damages, *see, e.g., Lawnwood Med. Ctr. Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla. Dist. Ct. App. 2010) ("[P]unitive damages may be the primary relief in a cause of action for defamation *per se*." (citing *Jones v. Greeley*, 6 So. 448, 450 (Fla. 1889)); *Nat'l Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 741 (Minn. 1982) ("In Minnesota, 'when words are defamatory per se punitive damages are recoverable without proof of actual damages.'" (ellipsis omitted) (quoting *Anderson v. Kammeier*, 262 N.W.2d 366, 372 (Minn. 1977))); *Collier v. Bryant*, 719 S.E.2d 70, 82 (N.C. Ct. App. 2011) ("To justify an award of punitive damages, nominal damages must be recoverable, but there is no requirement that nominal damages actually be recovered." (citing *Hawkins v. Hawkins*, 417 S.E.2d 447, 449 (N.C. 1992))—courts must independently determine whether allegedly defamatory statements are actionable. *See Simpson*, 64 V.I. at 486. "'Hyperbole and expressions of opinion not provable as false' fail to meet this actionability element of a defamation claim . . . ." *Id.* at 487 (quoting *Kendall v. Daily News Publ'g Co.*, 55 V.I. 781, 788 (2011)). For example, "[a] standalone statement that someone is 'dangerous' is a subjective opinion, not a provable fact, as instances of name-calling generally are. And 'a statement that is merely "rhetorical hyperbole," moreover, is considered nonactionable.'" *Alexander v.*

*Strong*, Ct. File No. 27-CV-20-2841, 2020 Minn. Dist. LEXIS 357, *6 (Minn. Dist. Ct. Dec. 7, 2020) (citations omitted). As the Restatements explain,

> [d]isparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession. . . . Thus, a statement that a physician consorts with harlots is not actionable *per se*, although a charge that he makes improper advances to his patients is actionable; the one statement does not affect his reputation as a physician whereas the other does so affect it. *Restatement (Second) of Torts* § 573 cmt. e (1977).

Other examples include a statement that a merchant is either insane or insolvent, both of which would be actionable *per se*, as would saying that a lawyer is ignorant and unqualified to practice law. *See generally id.* cmt. c, illus. 4-6. However, saying that a bricklayer is a hypocrite or that a university professor is a drunk would not be defamatory *per se* because being forthright or sober, respectively, are not inherently part of being a bricklayer or a professor.

¶60 Similarly, saying that someone does not know how to run a business is an opinion that could never be defamatory because "'only statements that are provable as false are actionable.'" *Simpson*, 64 V.I. at 487 (quoting *Kendall*, 55 V.I. at 788). *See also, e.g., Miller v. Richman*, 592 N.Y.S.2d 201, 203 (App. Div. 4th Dept. 1992) ("The individual defendants' unfavorable assessments of plaintiff's work are 'incapable of being objectively characterized as true or false[.]'" (citations omitted)); *see also id.* (collecting cases under state law where opinion was subject of defamation suit). Thus, the statements that Plaintiffs "didn't know what [they] were doing . . . [and] didn't know how to run a restaurant[,]" (Trial Tr. 210:1-4), were expressions of opinion and not defamatory because they could be provable as false.

¶61 In addition, the statements on the radio that Plaintiffs "were always late on rent . . . [and] were behind on rent[,]" *id.* at 210:2-3, were mostly true. Plaintiffs admitted that they had been late with rent, and cancelled checks admitted into evidence showed bounced checks, late payments, and checks that covered more than one month's rent. Plaintiffs' Exhibit 47 contains copies of cancelled checks from

October 2003 through June 2005. Rent for October 2003 was paid on October 7, 2003. However, rent for November and December 2003 was not paid until December 19, 2003. Rent for January 2004 was paid on January 4, 2004; rent for February 2004 was paid on February 1, 2004; but rent for March 2004 was not paid until March 12, 2004. Rent for April 2004 was paid on March 22, 2004, minus the cost of plumbing repairs. Rent for May and June 2004 was paid on June 7, 2004. Rent for July and August 2004 was paid on August 2, 2004, with roof repairs deducted. Rent for September and October 2004 was not paid until January 23, 2005. The check for rent for November and December 2004 and January 2005 was written on February 7, 2005, but it bounced and did not clear until March 2, 2005. Rent for February and March 2005 was paid on March 15, 2005. Rent for April 2005 was paid on April 14, 2005. Rent for May 2005 was paid on May 3, 2005. Finally rent for June 2005 was paid on June 9, 2005. Out of the twenty-one months Plaintiffs rented from Chrismos, they were clearly late nine times: November 2003, May 2004, July 2004, September 2004, October 2004, November 2004, December 2004, January 2005, and February 2005. Given the uncertainty about when rent had to be paid, the Court excluded from its count rent that was paid by the middle or the end of the same month in which it was due. 9 out of 21 is 42.86%, close to half. It may have been an exaggeration for Mosler to say Plaintiffs were always late but not by much.

¶62 The Court does acknowledge Plaintiffs' frustration with a landlord who, on the one hand, tells them it is okay if they cannot pay rent on time and then, on the other hand, goes around broadcasting to everyone when they do not pay on time. The Court also understands Plaintiffs' disappointment with a landlord sharing with the general public concerns that it has over how its tenant operates its own business. Vooys and Gerace did not go into business with Mosler and Hanley to operate the Beach Bar. Chrismos leased a building to Vooys and Gerace on its property. How that business was run—what the atmosphere was like, what clientele frequented the restaurant, what music was played, or what food was served—was

none of the landlord's concern so long as it did not subject the landlord to liability or violate the law. Mosler acknowledged that the Beach Bar was on a month-to-month tenancy. Chrismos could have evicted them at any time with thirty days' notice. Thus, it does beg the question why Mosler took to the radio to share grievances about his tenants and air their "dirty laundry" if all he wanted was for them to leave.

¶63    However, Plaintiffs did not assert a business disparagement claim. They asserted a defamation claim. *Cf. McDonald Oilfield Operations, LLC v. 3B Insp., LLC*, 582 S.W.3d 732, 749 (Tex. Ct. App. 2019) ("'Business disparagement and defamation are similar in that both involve harm from the publication of false information.'" (quoting *In re: Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015)); *see also id.* at 750 ("'To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff.'" (quoting *Lipsky*, 460 S.W.3d at 592)). Even when viewing the evidence in the light most favorable to Plaintiffs as the nonmoving parties, the Court cannot conclude that they proved defamation. No one testified as to what Hanley said except Hanley himself and no specific statements were attributed to him. The statements attributed to Mosler were either true or his opinion. Reed did mention that he heard Mosler say "something about drugs or something in that area . . . ." (Trial Tr. 520:24-25.) But he did not connect Mosler's statement directly to the Beach Bar or Vooys and Hanley. No documentary evidence was introduced at trial. What's more, Plaintiffs did not question Gerace as to what he heard or Mosler as to what he allegedly said. Vooys's testimony, even when corroborated by Woodson and Reed, simply does not establish statements that rise to the level of slander. Accordingly, the Court must grant Mosler and Hanley's motion for judgment as a matter of law and set aside the jury's verdict as to Count VI.

### iv. Punitive Damages

¶64    Defendants also move for judgment as a matter of law on the award of punitive damages,

challenging both the sufficiency of the evidence and the law. "Punitive damages are 'damages awarded in cases of serious or malicious wrongdoing to punish or deter the wrongdoer or deter others from behaving similarly — called also exemplary damages, smart money.'" *Cornelius v. Bank of Nova Scotia*, 67 V.I. 806, 824 (2017) (citation omitted). "Punitive damages must be based upon conduct that is not just negligent but shows, at a minimum, reckless indifference to the person injured — conduct that is outrageous and warrants special deterrence." *Id.*

¶65     Defendants had argued after Plaintiffs rested that by law punitive damages are unavailable for contract claims. They renewed that challenge after both sides rested and again, after the jury returned its verdict. However, at no point did either side inform the Court that the law in the Virgin Islands was not settled on the question. *See id.* at 824-25 (emphasizing that "it is reversible error for the trial court to fail to conduct a '*Banks* Analysis' in the first instance" and noting that "the trial court and the parties entirely failed to consider whether the courts of the Virgin Islands have ever adopted a definition of punitive damages, failed to consider the majority rule among the jurisdictions of the United States, and failed to consider what rule is most appropriate for the Virgin Islands[.]" (citations omitted)). Defendants are correct that persuasive authority does hold that "'punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.'" *Ishimatsu v. Royal Crown Ins. Corp.*, 8 N. Mar. I. 424, 439 (2010) (quoting *Restatement (Second) of Contracts* § 355 (1981)). "Punitive damages will not lie for breach of contract, even if it is proven that the breach is willful, wanton, or malicious. . . . [A] recovery of punitive damages can only be had where the alleged breach of contract 'merges with, and assumes the character of, a willful tort.'" *Bedell v. Inver Hous., Inc.*, 506 A.2d 202, 206 (D.C. 1986) (citations omitted). However, Defendants failed to inform the Court that Virgin Islands law is unsettled and thus, the Court could deem it waived. *Cf. Cornelius*, 67 V.I. at 825 (citing *Ubiles v. People*, 66 V.I. 572, 589 (2017)). However, because the Court

has already determined that the verdict on the contract claims must be vacated, further discussion as to whether Virgin Islands should permit punitive damages for contact claims would be academic at best.[9]

¶66     Nonetheless, after considering the arguments and the record, the Court concludes that the punitive damages award must be vacated. However, before addressing the sufficiency of the evidence, the Court must point out two errors with the jury verdict form that weigh in favor of setting aside the punitive damages award. First, even though both Vooys and Gerace demanded punitive damages, and even though the jury verdict form asked the jury to determine whether Defendants acted with reckless disregard for the rights of the Plaintiffs to entitle them to punitive damages, the verdict form only gave the jury the option of awarding punitive damages to Vooys. In other words, the verdict form, inadvertently, did not ask the jury how much they might have awarded Gerace, if they found that he was entitled to punitive damages. Plaintiffs did not object so any error would be waived but it underscores a potential source of confusion to the jury. Second, the verdict form also asked the jury to consider whether Plaintiffs were entitled to punitive damages separate and apart from any particular claim. There is no way for the Court to determine which or claims the jury determined warranted punishing Mosler and Hanley for. Virgin Islands law is clear that punitive damages is not a separate or stand-alone claim but simply a form of damages. *See Der Weer v. Hess Oil Virgin Island Corp.*, 61 V.I. 87, 102 (Super. Ct. 2014) (citing *Anthony v. FirstBank V.I.*, 58 V.I. 224, 227 n.4 (2012)); *Maxwell v. Amerada Hess Corp.*, Case No. SX-05-CV-846, 2010 V.I. LEXIS 128, *31 (V.I. Super. Ct. June 30, 2010) ("[P]punitive damages cannot be a stand alone claim . . . ."); *Hodge v. Daily News Publ'g Co., Inc.*, 52 V.I. 186, 200 (Super. Ct. 2009) ("[I]is not proper so plead punitive damages as a separate cause of action." (citing *Urgent v. Havana*, Civ. No. 103/2006, 2008 U.S. Dist. LEXIS 77455, *31 (D.V.I. Oct. 2, 2008)). The verdict form did instruct the jury that they were not

---

[9] Additionally, the jury verdict form limited punitive damages to the defamation and intentional misrepresentation claims, which also renders Defendants' argument academic.

to consider punitive damages unless they found one or more Defendants liable for intentional misrepresentation, defamation as to Gerace, or defamation as to Vooys. The jury found all three Defendants liable for intentional misrepresentation but only Mosler and Hanley liable for defamation and only imposed awarded punitive damages on Mosler and Hanley. Imposing punitive damages only on Mosler and Hanley but not Chrismos would correlate with the jury's defamation determination. Since the Court concluded that the verdict on defamation must be set aside, the award of punitive damages would also have to be set aside for the same reasons.

¶67 Yet, even if the Court were to assume that the jury imposed punitive damages on Mosler and Hanley, but not Chrismos, for the intentional misrepresentation, the Court still cannot find that Plaintiffs proved punitive damages by clear and convincing evidence. *Cf. Atlantic Human Resource Advisors, LLC, v. Espersen*, 2022 VI 11, ¶ 70 (citing 5 V.I.C. § 740(5)). To be sure, punitive damages is an appropriate sanction for fraudulent or intentional misrepresentation. *Cf. DeNofio v. Soto*, No. 00-5866, 2003 U.S. Dist. LEXIS 12225, *4 (E.D. Pa. June 24, 2003) ("Punitive damages may be imposed where there is 'sufficiently aggravated conduct contrary to the plaintiff's interests, involving bad motive or reckless indifference . . . .' Fraudulent misrepresentation certainly meets this standard." (citation and ellipsis omitted)); *accord Naranjo v. Paull*, 803 P.2d 254, 261 (N.M. Ct. App. 1990) ("Punitive damages is an appropriate sanction for common-law fraud."). But it is not mandatory that punitive damages be awarded because punitive damages punishes wrongdoers and makes an example out of them to others. *See Cornelius*, 67 V.I. at 824. In fact, "the focus of punitive damages is not the individual plaintiff." *Duhon v. Conoco*, 937 F. Supp. 1216, 1220 (W.D. La. 1996) ("'Punitive damages thus have more to do with the tortfeasor than with the victim.'" (quoting *Billiot v. B.P. Oil Co.*, 645 So. 2d 604, 612 (La. 1994)). Instead "a punitive damages award is about the defendant's actions. 'The purpose of punitive damages is not to compensate a plaintiff but to punish the guilty, deter future misconduct, and to demonstrate society's

disapproval.'" *Dardinger v. Anthem Blue Cross & Blue Shield*, 781 N.E.2d 121, 145 (Ohio 2002).

¶68 First, "rather than assessing the reprehensibility of all defendants collectively, it is important to consider the role each defendant played in that conduct." *Espersen*, 2022 VI 11 at ¶ 82. Plaintiffs failed to distinguish between the conduct of Hanley and that of Mosler, with respect to the intentional misrepresentation claim. In fact, the evidence tended to show that Hanley was more willing to work with Plaintiffs than Mosler and, arguably, seemed to be more concerned for them overall, meeting with them to show them how to determine the value of the business, for example. The testimony also tended to show that Hanley was more involved than Mosler. But even when viewing all the evidence in the light most favorable to Plaintiffs, the Court cannot conclude that it shows, clearly and convincingly, that either Mosler or Hanley acted with "reckless indifference" or engaged in "conduct that is outrageous and warrants special deterrence." *Cornelius*, 67 V.I. at 824. At best, the evidence shows that a 25-year-old "kid," (Trial Tr. 439:16-17), and his fiancée, both new to the restaurant industry, were taken advantage of by two older and more sophisticated businessmen. Mosler, an "economist" and "special[ist] in monetary operations[,]" *id.* at 710:15, 23, and Hanley, a seasoned relator, established a limited liability company to purchase several parcels of land on which a restaurant, residential cottages, and a dive shop were situated. They inherited—not only the tenants of the prior landowners—but problems with those buildings. They encouraged Vooys and Gerace to make repairs to the restaurant while leading them to believe that they would give them a lease in return. As the Court noted earlier, Plaintiffs and the Chrismos Defendants were in a contractual relationship as tenants and landlord but were also negotiating a new relationship, a long-term landlord-tenant relationship. There was no duty to bargain or negotiate in good faith at that point. Vooys and Gerace took Mosler and Hanley at their word, ultimately to their detriment, because Mosler eventually began to look for a new tenant to replace them. He succeeded. That does not rise to the level of outrageous conduct that warrants special deterrence, however.

¶69     Admittedly, land is scare on an island and commercial space is at a premium. The Beach Bar could not easily relocate to a different location and retain its unique characteristics. But rather than insist, as Jordan did for example, on having a lease before making further improvements, Vooys and Gerace trusted Mosler and Hanley. Whether that was unwise is not clear under Virgin Islands law. *But cf. Parke-Hayden, Inc. v. Loews Theatre Mgmt. Corp.*, 91 Civ. 0215 (RWS), 1993 U.S. Dist. LEXIS 10318, *8-9 (S.D.N.Y. July 24, 1993) ("New York law still adheres to the common law doctrine of *caveat emptor* in real estate negotiations The lack of a duty to bargain in good faith has been considered part of the definition of freedom of contract . . . ." (citations omitted)). The jury determined that the Chrismos Defendants intentionally misrepresented that they intended to give Vooys and Gerace a long-term lease. That misrepresentation, on its own, cannot rise to the level of warranting punitive damages, otherwise, punitive damages would always be awarded any time someone was found liable for fraudulent or intentional misrepresentation. There must be something more and it is the something more that was lacking here.

¶70     Vooys and Gerace knew before they moved to St. Croix that there was no lease for the Beach Bar. (*See* Trial Tr. 172:16-17 ("We actually found out that when we were in Florida, before we flew down.").) Vooys explained why they still decided to continue:

> [b]ecause we had gotten that far. We had sold a condo, packed up all our stuff. Word sent to Joe, went down end of June, we were daydreaming about it and what to do and what we would do and how great it would be for over a month. So when we found out there was no lease, we thought we'd take a leap of faith and continue. *Id.* at 172:19-24.

They could have delayed the move or even delayed the closing, which did not occur until August 7, 2003. They also learned soon after they arrived that the land under the Beach Bar was being sold. Although they would not have it known at the time, Chrismos was not formed until September 7, 2003, so the closing on the land purchase had to have occurred sometime afterward. Vooys testified that they asked Mosler and Hanley about a long-term lease the same day they met them as the new owners, yet did nothing to speed

up that process. She did testify that they "kept asking for a seven-year lease[,]" *id.* at 215:21, but what else they did, if anything, was not explained, nor was what Hanley or Mosler said in response. Thus, the evidence, even viewed in the light most favorable to Plaintiffs, shows only that Mosler and Hanley mislead Vooys and Gerace into thinking they would get a long-term lease. This is not conduct so outrageous that it must be punished by punitive damages. Accordingly, the Court will also set aside the jury's award of punitive damages against Mosler and Hanley.

### III.    Motion for New Trial

#### A.  Legal Standard

¶71    "Virgin Islands Rule of Civil Procedure 59(a)(1)(A)(vi) provides in relevant part that: 'The court may, on motion, grant a new trial on all or some of the issues — and to any party — as follows: for attorney or party misconduct that undermined the trial.'" *R.J. Reynolds Tobacco Co. v. Gerald*, 2022 VI 4, ¶ 24. Courts evaluating motions for new trial based on an attorney's remarks during closing arguments "must assess whether the closing arguments were both improper and prejudicial, meaning that they impacted the substantial rights of a party." *Id.* (collecting cases). Thus, for Defendants to prevail they "must show that the conduct complained of was in fact improper and that the improper argument was so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial." *Id.* at ¶ 25.

#### B.  Discussion

¶72    Defendants argue, in the alternative, that they should be given a new trial because of comments Plaintiffs' counsel during closing arguments that undermined the fairness of the trial. During her closing argument, Plaintiffs' counsel said, "And then had they had a lease, had there been a promise for that maintained, we know from Miss Alex Myers, they could have sold that lease . . for $125,000. So the failure to give them that lease that was promised, they lost the ability to sell that lease." The Court had to call a short recess before Plaintiffs' counsel had concluded, and Defendants during the break, Defendants

moved for a mistrial based on the reference to Myers's testimony.

¶73    Alex Myers had been called by Plaintiffs as a rebuttal witness to impeach Jordan. Jordan had testified that he sold the Beach Bar (including the seven-year lease) for around $25,000.00 or $30,000.00 and denied that the total sales price was $120,00.00. Myers impeached his testimony when she told the jury she purchased the Beach Bar (including the lease) from Jordan for approximately $175,000.00. She also told the jury and that she had fallen behind on the rent owed to Chrismos. After Defendants moved for a mistrial, the Court reiterated that Myers's testimony was limited solely to impeachment and then deferred ruling until closing arguments were over. Once counsel finished, the Court ruled that Plaintiffs' counsel's arguments were "not so egregious to declare a mistrial . . . [and] final instruction would show and explain that argument by counsel is not evidence and that the[ jury] must rely upon their memory as to the facts of this case." (Trial Tr. 1108:6-10.) However, the Court did emphasize that "[i]f there is another instance *like that*, I will review the record and if I find it is cumulative, the Court will find it's egregious and I will declare a mistrial." *Id.* at 1108:13-16 (emphasis added). After Defendants' counsel made his closing arguments and Plaintiffs' counsel gave her rebuttal, Defendants then renewed their motion for a mistrial based on misstatements of Plaintiffs' counsel. The Court took the matter under advisement. In their post-trial motion, Defendants renewed their request for a new trial.

¶74    The first statements Defendants point to concern check number 722 for $2,000.00. Plaintiffs' version, admitted as part of a group as Plaintiffs' Exhibit 47, had "July / August -1000 for Roof" written on the memo line, whereas the memo line on Defendants' copy of the same check was blank. Defendants' counsel argued in his closing that Vooys wrote the notation on the memo line to falsify the evidence. Plaintiffs' counsel in rebuttal claimed it was not falsification. Instead, according to her, Gerace had signed the check but simply forgot to add the notation on the memo line. However, Plaintiffs' counsel confused two different checks. Gerace had signed check number 544 for $921.00 with the notation "Rent March –

Plumber Bills" which Vooys later corrected by crossing out "March" and writing "April." Vooys signed check number 772 for $2,000.00 and wrote "July / August -1000 for Roof" on it after it was returned. She explained that she may have added the notation afterward to explain why the payment did not match the rent due. Plaintiffs' counsel did conflate two different pieces of evidence and thus, her argument was improper, but the Court does not find any prejudice here because the jury was instructed that their recollection of the facts controls.

¶75   The second statements Defendants' point to are Plaintiffs' counsel's summary of facts that—to put it plainly—were not in evidence. "'The cardinal rule of closing argument is that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence.'" *R.J. Reynolds Tobacco Co.*, 2022 VI 14 at ¶ 40 (brackets omitted) (quoting *James v. People*, 59 V.I. 866, 888 (2013), parenthetically)). Plaintiffs' counsel violated this rule when she spoke about Vooys and Gerace wanting to leave St. Croix and cut their losses but Mosler and Hanley convinced them to stay, promising to make a deal. (*See* Trial Tr. 1114:24-1115:5 ("[B]ut at some point they said, we don't get – if we don't get a lease, this isn't going to work, we should take our losses and go. And that's when Mosler and Hanley say, no, don't do that, we'll make a deal for you to stay. And so they did. And they invested. And they made improvements.").) There was no testimony about Vooys and Gerace wanting to sell the Beach Bar, cut their losses, and leave island. "The purpose of closing argument is to mold the facts given during trial in the light most favorable to one's client[,]" *James*, 56 V.I. at 888, not to make up facts to enhance that light.

¶76   The third statements Defendants point to concern whether the Beach Bar was open in June 2005. Reed, the bartender, had recalled that the Beach Bar was closed "sometime towards end of May, maybe somewhere in that area . . . ." (Trial Tr. 516:16-17.) When asked if he was guessing, he said he was. *See id.* at 516:20-22 ("I'm going to guess within a month period. I'm sorry. I'm going to – that's all I can

remember on that part."). On cross-examination, he reiterated that the Beach Bar was "open until the very end[,] *id.* at 532:21, but believed that "the end" was in May. During rebuttal, Plaintiffs' counsel referenced Reed's testimony, specifically that he was there till the end, and argued that the restaurant was open in June because Plaintiffs' paid rent. Defendants claim counsel misrepresented the evidence. However, that evidence was conflicting at best. Vooys did testify that they vacated the premises at the end of June 2005 and the restaurant was open that month. On cross-examination, she reiterated that the Beach Bar was open in June, but when pressed—and presented with contrary testimony from her deposition—Vooys backtracked, saying "I believe we were open in June. I don't know if it was 'til the end of June." *Id.* at 286:22-23. When pressed further, Vooys said "I have gross receipts for June so I made money . . . ." *Id.* at 287:1. Vooys was later recalled so the Beach Bar's taxes could be admitted into evidence. On redirect, she stated that she believed the Beach Bar was open in June because they paid rent for June. However, after seeing no gross receipts for June, Vooys conceded that the restaurant must not have been open. Given the conflicting testimony, the Court does not find Plaintiffs' counsel's characterization of the evidence prejudicial.

¶77    The fourth statement Defendants point to is Plaintiffs' counsel's characterization of the April 12, 2005 letter as an illegal attempt to evict Vooys and Gerace. During rebuttal, Plaintiffs' counsel characterized the letter as follows:

> So the idea that they – that they didn't give them a notice to quit, that letter – when you serve someone with a letter and tell them that you've got – on April 12th, which you got it April 18th, and they tell you you have to get out or we're going to take your stuff and throw it away by April 30th, that's illegal. You can't do that. *Id.* at 1125:9-15.

Defendants contend that "characterization of this letter and the applicable law is totally wrong, as the letter only sought to confirm they were leaving and asked to be corrected if they were not doing so." (Defs' R. 50(b) & R. 59(a) Post-Tr. Mots. 18.) However, Defendants overlook that Plaintiffs' counsel make similar

remarks during her opening statement, which their attorney attempted to refute. (*Compare* Trial Tr. 125:23-126:13, *with id.* at 143:9-20.) Defendants also overlook testimony comparing the letter to an eviction notice: it was written by an attorney on behalf of a landlord and served by a process server, stating what would happen if the tenants did not leave. Gerace and Vooys referred to the letter as an eviction letter, which Hanley denied. "In attempting to convince a jury that a defendant's conduct was outrageous and should be punished, an advocate must go beyond the kind of arguments necessary to establish ordinary negligence." *Herman v. Hess Oil V.I. Corp.*, 10 V.I. 521, 538 (D.V.I. 1974) (footnote omitted), *aff'd* 12 V.I. 240 (3d Cir. 1975). The Court finds no prejudice from Plaintiffs' counsel characterization of the letter, particularly since the Court also instructed the jury as to the definition of a notice to quit or to terminate a tenancy.

¶78    The fifth statement Defendants point to concerns Plaintiffs' counsel's reference to Defendants' burden of proof regarding defamation. Plaintiffs' counsel argued in rebuttal that Defendants could have called Roger Morgan as a witness. (*See* Trial Tr. 1126:15-23 ("Now, and where's Roger Morgan? Well, first of all, the judge, I believe, will instruct you that no one is required to bring all the witnesses that there are. But there's no evidence in this case that anybody has the ability to bring Mr. Morgan here. So – and if indeed they wanted to prove that they didn't say those things on Mr. Morgan's show, it would be they who would bring Mr. Morgan and they did not.").) Defendants correctly note that it is the plaintiff who has the burden of proof. By arguing, during rebuttal, that Defendants should have produced evidence in their defense, which they did get a chance to respond to, Defendants claim they were prejudiced. The Court disagrees. The jury was instructed on the burden of proof and further, that the court's instructions, not the arguments of counsel, must guide their deliberations.

¶79    The last statement Defendants point to concerns Plaintiffs' counsel's reference to Woodson having heard Mosler and Hanley defame Plaintiffs on the radio. In his closing, Defendants' counsel pointed out

that Plaintiffs had "called John Woodson. Did John Woodson say that he heard anything negative about them? No." *Id.* at 1084:24-25. During her rebuttal argument, Plaintiffs' counsel responded, saying

> And the statement that says Mr. Woodson didn't say that he heard bad things on – being said by Hanley and Mosler. His testimony was, I called up the show to – let me see if I got it. I called up the show to support it – to support them. Well, you wouldn't call up the show to support Vicki – Vic and Joe if people weren't saying bad things about them. So of course he heard people saying bad things about them. That's the reason he called to support them. *Id.* at 1126:24-1127:8.

Defendants argue that Plaintiffs' counsel misrepresented the evidence, claiming "Woodson only testified that he called in to support Reggae . . . ." (Defs' R. 50(b) & R. 59(a) Post-Tr. Mots. 18.) Here, both sides are mistaken. Woodson had testified that he heard from Vooys and Gerace and on the airwaves that they were being put out of the restaurant. The Court raised and sustained its own objection to Woodson's statement that he heard it on the airwaves. Counsel then asked if Woodson himself had ever gone on the airwaves to complain about Vooys and Gerace being removed from the restaurant, and he said yes. He claimed, in his opinion, the reason "was not a noise issue at Cane Bay. It had to do with the music and type of clientele that that music probably brought." (Trial Tr. 392:18-20.) When asked directly if he ever heard Mosler or Hanley on the radio, Woodson said, "Not that I can recall." *Id.* at 395:20, 22. The word "support" does not appear anywhere in his testimony and Woodson did not tell the jury that he called the radio in support of reggae music. Thus, Defendants are mistaken. Further, even though Woodson did not hear Mosler or Hanley on the radio, he did testify that he had heard from Plaintiff why they were being put out of the restaurant and, when coupled with the other testimony, the jury could reasonably infer that Woodson was of the opinion that the full moon parties and reggae music motivated Mosler and Hanley's decision. The Court finds no prejudice from Plaintiffs' counsel's arguments here.

¶80    Finally, Defendants argue that the cumulative effect of all the misstatements of Plaintiffs' counsel warrants a new trial. Courts "assume that juries for the most part understand and faithfully follow

instructions." *Frett v. People*, 66 V.I. 399, 413 (2017). *See also Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006) (even where there has been misleading argument by counsel, juries are presumed to follow court instructions). More importantly, however, Defendants have failed to show how Plaintiffs' counsel's misstatements prejudiced them. It is not the duty of the Court to scour the record looking for support for a party's arguments Since the Court did in fact instruct the jury that either counsel's arguments are not to be considered as evidence and considering that courts assume that juries followed instructions, the Court concludes that the conduct of Plaintiffs' counsel, while certainly far from laudable, did not undermine the fairness of the trial.

## IV.     CONCLUSION

¶81     For the reasons stated above, the Court concludes that Plaintiffs failed to carry their burden of proof as to defamation, breach of the duty of good faith and fair dealing, and breach of an agreement to enter into a lease. The Court further concludes that the award of punitive damages is unwarranted here. Accordingly, the Court will grant Defendants' motion in part and set aside the jury's verdict as to all three counts and the award of punitive damages. The Court will deny Defendants' motion as to the verdict for intentional misrepresentation and deny the motion for a new trial. An order accompanying this Opinion, and a judgment, will follow.

**DONE this** 12th **day of September, 2022.**

HAROLD W.L. WILLOCKS
Administrative Judge of the Superior Court

**ATTEST**:
Tamara Charles
Clerk of the Court

By: _____
      Court Clerk _____
Dated: _____9/12/2022_____